# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LEONARD COYER, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| IMPRIVATA, INC., OMAR HUSSAIN, JEFFREY KALOWSKI, GENERAL CATALYST GROUP II, L.P., HIGHLAND CAPITAL PARTNERS VI LIMITED PARTNERSHIP and POLARIS VENTURE PARTNERS III, L.P., | ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Civil Action No.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

CLASS ACTION

Plaintiff Leonard Coyer has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Imprivata, Inc. ("Imprivata" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of purchasers of the common stock of Imprivata between July 30, 2015 and November 2, 2015, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District, and Imprivata's executive offices are located in this District.

5.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the New York Stock Exchange (the "NYSE"), a national securities exchange located in this District.

## PARTIES

6.      Plaintiff Leonard Coyer, as set forth in the accompanying certification and incorporated by reference herein, purchased the common stock of Imprivata during the Class Period and has been damaged thereby.

7.      Defendant Imprivata is an IT security company that provides authentication and access management technology solutions for the healthcare industry in the United States, the United Kingdom, and internationally.   Imprivata common stock is listed and trades on the NYSE, an efficient market, under the ticker symbol "IMPR."  As of November 3, 2015, the Company had more than 25 million shares issued and outstanding.

8.      Defendant Omar Hussain ("Hussain") is, and was at all relevant times, the President, Chief Executive Officer ("CEO") and a member of the Imprivata Board of Directors

9.      Defendant Jeffrey Kalowski ("Kalowski") is, and was at all relevant times, the Chief Financial Officer ("CFO") of Imprivata.

10.     Defendants Hussain and Kaolowski are collectively referred to herein as the "Individual Defendants."

11.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Imprivata, were privy to confidential and proprietary information concerning Imprivata, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Imprivata, as discussed in detail below.  Because of their positions with Imprivata, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

12.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Imprivata's business.

13.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

14.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock were, and are, registered with the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Imprivata's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Imprivata common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

15.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Imprivata common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Imprivata's business, operations and management and the intrinsic value of Imprivata common stock; (ii) enabled the Individual

Defendants and other Imprivata insiders to sell their personally held Imprivata stock to the unsuspecting public generating proceeds of more than $72 million; and (iii) caused Plaintiff and members of the Class to purchase Imprivata common stock at artificially inflated prices.

16.     Defendants General Catalyst Group II, L.P. ("General Catalyst"), Highland Capital Partners VI Limited Partnership ("Highland Capital") and Polaris Venture Partners III, L.P. ("Polaris"), including entities affiliated with them (collectively, the "Controlling Shareholder Defendants"), each of which owned 25.1% of the Company's common stock prior to Imprivata going public, continued owning 19.6% of Imprivata equity each following the Company's July 2014 initial public stock offering (the "IPO").  The Controlling Shareholder Defendants collectively owned a controlling interest in Imprivata following the IPO and General Catalyst Managing Director David Orfao, Highland Capital founder and General Partner Paul Maeder, and Polaris Managing Partner David Barrett all continued serving as members of the Imprivata Board of Directors following the IPO.

17.     The Individual Defendants together with Defendant Imprivata and the Controlling Shareholder Defendants are collectively referred to herein as "Defendants."

## CLASS ACTION ALLEGATIONS

18.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of Imprivata between July 30, 2015 and November 2, 2015, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

19.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Imprivata common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified

from records maintained by Imprivata or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

20.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

21.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

22.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Imprivata;

(c)    whether the price of Imprivata common stock was artificially inflated during the Class Period; and

(d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

23.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

24.    Defendant Imprivata was founded in 2001 and is headquartered in Lexington, Massachusetts.  Imprivata was founded by entrepreneurs Phil Scarfo and David Ting who had

developed identity management technology while working at Polaroid Corporation's small business incubator.

25.     Imprivata shipped its first product, the OneSign Enterprise Single Sign-On appliance in 2004.  In 2005, Imprivata expanded its infrastructure to Europe, Africa and the Middle East, and introduced OneSign 3.0, an upgraded product that increased extensibility and expanded its strong authentication management capabilities to include physical access cards, One-Time Password tokens, ID cards, proximity cards, etc., in addition to its finger biometric support already offered in the initial platform offering.  In 2009, Imprivata acquired the assets of IdentiPHI, a manufacturer and reseller of biometric solutions, including the SAFsolution product line.

26.     Today, the Company's flagship product offering is still Imprivata OneSign, an integrated enterprise single sign-on, authentication management, and workflow automation platform that addresses various security and productivity challenges faced by hospitals and other healthcare organizations.   OneSign is an IT solution that helps companies manage user access and authentication.   The OneSign platform provides a single framework that purportedly allows companies to streamline application access by enabling all enterprise applications for single sign on without requiring custom scripting or modifications to existing directories.   OneSign can also purportedly strengthen user authentication to desktops and networks by replacing passwords with a range of authentication options that include finger biometrics, proximity cards, smart cards, many national and government ID cards, One-Time-Password tokens, and an employee's physical location.

27.     According to Imprivata's public filings, the Company has "lengthy" "sales cycles for new customers" as the Company's "sales efforts involve educating [its] customers about the use and benefits of [its] authentication and access management solutions, including demonstrating the potential of [its] solutions in streamlining clinician workflow and increasing productivity." According to the Company, "[c]ustomers may undertake a significant evaluation process, involving not only [Imprivata's] solutions but also the customer's existing healthcare information technology infrastructure," which "assessment can result in a lengthy . . . sales cycle."

28.     On June 25, 2014, Imprivata completed its initial public stock offering ("IPO"), selling 5.75 million shares at $15 per share and receiving more than $86 million in gross proceeds. Following the IPO, the three Controlling Shareholder Defendants, each of which owned 25.1% of the Company's common stock prior to the IPO, continued owning 19.6% of its equity each.  They collectively owned a controlling interest in Imprivata following the IPO and General Catalyst Managing Director David Orfao, Highland Capital founder and General Partner Paul Maeder, and Polaris Managing Partner David Barrett all continued serving as members of the Imprivata Board of Directors following the IPO.

29.     On July 1, 2015, the Company filed a Registration Statement on Form S-3 with the SEC (the "Registration Statement") registering more than 13 million shares for resale by certain unidentified "Selling Stockholders."  Imprivata utilized a "shelf" registration, or continuous offering process.  The Registration Statement expressly incorporated by reference certain Imprivata SEC filings and all future filings until the date of any offering conducted under the shelf registration statement was completed.  On July 15, 2015, the SEC declared the Registration Statement effective.

30.     The Class Period starts on July 30, 2015.  On July 29, 2015, after the close of trading, Imprivata issued a press release announcing its financial results for its 2015 second quarter, the period ended June 30, 2015 ("2Q15").  The release emphasized that Imprivata had substantially grown revenues and significantly decreased losses year-over-year during the 2Q15, including stating that "[r]evenues for the three months ended June 30, 2015 were $30.0 million, *an increase of 29%* from revenues of $23.2 million for the same period in 2014," that "[r]evenues for the six months ended June 30, 2015 were $55.6 million, *an increase of 30%* from revenues of $42.7 million for the same period in 2014," that the "[n]et loss for the three months ended June 30, 2015 was $5.4 million, or $(0.22) per basic and diluted share attributable to common stockholders, as compared to a net loss of $4.8 million, or $(1.08) per basic and diluted share attributable to common stockholders for the same period in 2014," and that the "[n]et loss for the six months ended June 30, 2015 was $12.1 million, or $(0.51) per basic and diluted share attributable to common stockholders, as compared to a net loss of $13.1 million, or $(3.25) per basic and diluted share attributable to common stockholders

for the same period in 2014."[1]  The release also quoted Defendant Hussain commenting on the 2Q15

results, stating, in pertinent part, as follows:

> The second quarter marks the one year anniversary since our IPO, and I am very proud of our performance.  ***We have shown strong revenue growth, expanded our product platform, and completed a key acquisition.  We have driven growth through both the acquisition of new customers, and strong add-on business to our existing customers. I am especially excited about the launch of our PatientSecure product, which expands our market to address frustrations faced by patients and registrars.  PatientSecure will solidify our leadership as a security platform for healthcare, solving critical workflow challenges for electronic health records, communications, electronic prescribing, and patient identification***."

31.    The release also provided the following "Third Quarter and Full-Fiscal 2015

Financial Outlook," that the Company was purportedly then on track to achieve:

> For the full-year, ***we expect revenue between $124.0 million and $126.0 million*** and Adjusted EBITDA to be between ***a loss of $10.0 million and $8.5 million***. In terms of earnings per share, we expect GAAP loss to be between $(0.82) per share and $(0.76) per share and non-GAAP net loss, which adjusts for stock-based compensation, amortization of purchased intangible assets, transaction costs associated with business acquisitions, transaction costs associated with offerings of our common stock and the contingent liability revaluation, to be between $(0.60) per share and $(0.54) per share.  Our annual EPS estimates are based on an estimated weighted average-share count of 24.2 million.

> For the third quarter, ***we expect revenue between $31.0 million and $31.5 million*** and Adjusted EBITDA to be ***between a loss of $4.2 million and $3.9 million***.  In terms of earnings per share, we expect GAAP loss to be between $(0.27) per share and $(0.25) per share and non-GAAP net loss, which adjusts for stock-based compensation, amortization of purchased intangible assets, transaction costs associated with business acquisitions, transaction costs associated with offerings of our common stock and the contingent liability revaluation, to be between $(0.22) per share and $(0.20) per share.  Our third quarter EPS estimates are based on an estimated weighted average-share count of 24.3 million.

32.    Later that afternoon, Imprivata held a conference call with analysts and investors to

discuss the Company's earnings and operations.  During the conference call, Defendant Hussain

opened his remarks emphasizing that the Company had "successfully delivered on all of [its growth]

objectives" laid out at the time of its IPO, including "[w]in[ning] new customers, increas[ing] sales

to [its] installed base, develop[ing] new products, grow[ing] internationally, and mak[ing] strategic

acquisitions . . . throughout the year."  Hussain also emphatically maintained that Imprivata had "***set***

---

[1]    All emphasis is added unless otherwise noted.

*[itself] up for continued growth in 2016 and beyond*," and detailed "*the prevailing market forces that [then] continue[d] to drive [its] growth*," including "continued momentum with add-on sales to [its] existing customer base, new customer wins, as well as competitive displacements." Summarizing during his opening remarks, Defendant Hussain emphasized that "[a]s I look to the remainder of 2015 and into 2016, it is clear that security is the number one concern and priority for hospitals, *and our multi-product platform is well positioned to capitalize on this market opportunity*."

33.     During the conference call, Defendant Kalowski also emphasized that Imprivata was then experiencing very strong demand for its product offerings, which he claimed, that along with its huge sales backlog, would support the strong sales growth Defendants were forecasting for the 3Q15, stating, in pertinent part, as follows:

> In Q2, we experienced this for the first time, as some customers purchased Imprivata Confirm ID together with Imprivata OneSign. The deferred revenue is included in our backlog and will be recognized over the next year. *We are seeing increased demand for our subscription products and I want to point out that as we cross-sell our subscription-based products, we expect this trend to continue*. That said, bookings are unaffected and our forward guidance anticipates this.
>
> Our total backlog, including deferred revenue from our balance sheet, increased to $42.9 million at the end of the second quarter, an increase of $2.2 million from Q1. *We anticipate recognizing revenue of approximately $26.8 million from the backlog over the course of 2015, $17.5 million of which is maintenance revenue*.

34.     Indeed, Defendant Kalowski stated that the strong performance had actually justified raising revenue guidance for fiscal 2015 and represented that the Company was then on track to becoming profitable by 2016, stating, in pertinent part, as follows:

> Finally, I want to review our 2015 financial outlook. We are narrowing our revenue range for full-year 2015 *by raising the low end of the range from $123.5 million to $124 million*. Our new range is $124 million to $126 million.
>
> Adjusted EBITDA is unchanged and will be in the range of a loss of $10.0 million to $8.5 million. In terms of earnings per share, we expect the GAAP loss to be between $0.82 per share and $0.76 per share. The non-GAAP loss per share, which adjusts for stock-based compensation, amortization of purchased intangible assets, acquisition costs, shelf registration costs, and the contingent liability revaluation, is anticipated to be between $0.60 per share and $0.54 per share. Our annual EPS estimates are based on an estimated weighted average share count of 24.2 million.
>
> For the third quarter, we expect revenue between $31.0 million and $31.5 million, and adjusted EBITDA to be between a loss of $4.2 million and $3.9 million. We

estimate the GAAP loss per share to be between $0.27 and $0.25 per share, and non-GAAP loss per share to be between $0.22 and $0.20 per share.  Our second quarter EPS estimates are based on an estimated weighted average share count of 24.3 million shares.

Historically, we have seen significantly higher revenues in the fourth quarter, *and as a result we are forecasting an EBITDA profit in Q4*.  However, we are reiterating that, for 2016, *we will not be profitable until the second half of that year*.

35.     During the Q&A portion of the conference call, in response to a stock analyst's question whether "anything [had] changed since [the] IPO" in terms of market "expectations," Defendant Hussain further emphasized the strong demand the Company was purportedly then experiencing, stating, in pertinent part, as follows:

> . . . when we started, we were selling a solution, a single product solution to solve a very specific set of workflow problems.  *I think today, security has become front and center in healthcare.  With both HHS clamping down on violations of patient security and privacy issues, and with the breaches at some very well-known healthcare insurance companies, health securities become front and center, and we're seeing that across the horizon for demand on our products*.
>
> In fact, the interesting thing, one of the reasons for the HT acquisition was that patient identification has become a very big issue.  It was the number one issue that CHIME brought up, the CIOs at CHIME brought up to HHS this year.  *So, we think we're in a very good position to continue to provide our customers with really critical products that solve really critical problems that are front and center on their radar right now*.

36.     On August 3, 2015, Imprivata announced that it was commencing an underwritten secondary public offering of up to 4.35 million shares of common stock held by existing stockholders.  In addition, the selling stockholders had granted the underwriters a 30-day option to purchase up to an additional 15% of the shares of the common stock offered in the public offering. *The more than 5.25 million shares were all priced and sold at $15 each that day*.  The selling stockholders were the three Controlling Shareholder Defendants, each of which owned 18.3% of Imprivata prior to the offering and thus collectively controlled the Company.  The Controlling Shareholder Defendants sold a significant amount of their Imprivata holdings, reducing their collective holdings of 54.9% by approximately 38% down to a 33.36% collective ownership interest.

37.     Pursuant to Item 303 of Regulation S-K [17 C.F.R. §229.303], and the SEC's related interpretive releases thereto, issuers are required to disclose events or uncertainties that have had or

are reasonably likely to cause the registrant's financial information not to be indicative of future operating results, including any known trends.  At the time of the secondary stock offering on August 3, 2015, as detailed below, Imprivata's revenue growth had been adversely impacted and it had been experiencing a significant decline in demand for its product offerings.  The adverse events and uncertainties associated with these declining trends were reasonably likely to have a material impact on the Company's profitability, and, therefore, were required to be disclosed in the Registration Statement.  No such disclosure was made.

      38.     In addition to these outsized sales by the Controlling Shareholder Defendants in the August 3, 2015 secondary offering, other Imprivata executives cashed in, including each of the Individual Defendants, selling more than $4 million of their personally held shares at fraud-inflated prices at unusual amounts, compared to their historical trading patterns, as follows:

| | DATE | # SHARES SOLD | PRICE | GROSS PROCEEDS |
|---|---|---|---|---|
| **OMAR HUSSAIN** | 8/11/15 | 40,000 | $18.13 | $725,200 |
| President & CEO | 8/17/15 | 15,000 | $19.64 | $294,600 |
| | 9/15/15 | 15,000 | $19.98 | $299,700 |
| | | 70,000 | | *$1,319,500* |
| | | | | |
| **JEFFREY KALOWSKI** | 8/3/15 | 7,000 | $14.87 | $104,090 |
| CFO | 8/11/15 | 12,000 | $18.13 | $217,560 |
| | 9/1/15 | 8,639 | $20.07-$20.08 | $173,465 |
| | 10/1/15 | 5,000 | $17.27 | $86,350 |
| | 10/12/15 | 100 | $18.00 | $1,800 |
| | 10/13/15 | 900 | $18.01 | $16,209 |
| | | 33,639 | | *$599,474* |
| | | | | |
| **DAVID TING** | 8/3/15 | 2,237 | $15.03 | $33,622 |
| Founder, Chief Technology | 8/4/15 | 1,763 | $15.01 | $26,463 |
| Officer and Director | 8/5/15 | 2,000 | $16.01 | $32,020 |
| | 8/10/15 | 10,771 | $17.11 | $184,292 |
| | 8/12/15 | 18,000 | $19.01 | $342,180 |
| | 9/1/15 | 11,000 | $20.08-$20.09 | $220,910 |
| | 10/1/15 | 8,000 | $17.27-$17.48 | $138,580 |
| | | 53,771 | | *$978,067* |
| | | | | |
| **THOMAS BRIGIOTTA** | 8/3/15 | 2,797 | $15.03 | $42,039 |
| Sr. VP Worldwide Sales & | 8/4/15 | 2,203 | $15.01 | $33,067 |

| | | | | |
|---|---|---|---|---|
| Field Operations | 8/17/15 | 20,000 | $19.98 | $399,600 |
| | 9/1/15 | 639 | $20.07 | $12,825 |
| | 9/2/15 | 10,000 | $19.23 | $192,300 |
| | 10/2/15 | <u>5,000</u> | $16.68 | <u>$83,400</u> |
| | | 40,639 | | *$763,231* |
| | | | | |
| **CHRISTOPHER SHAW** | 8/17/15 | 22,000 | $19.64-$20.04 | $440,080 |
| Senior VP, GM OneSign | 9/1/15 | 639 | $20.07 | $12,825 |
| Products Group | 9/15/15 | <u>4,000</u> | $19.98-$20.00 | <u>$79,960</u> |
| | | <u>26,639</u> | | ***<u>$532,865</u>*** |
| | | | | |
| *Total* | | *224,688* | | *$4,193,137* |

39.     The statements referenced above in ¶¶ 29-34 and 36 were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)     that demand for the Company's IT security offerings had fallen significantly, particularly with smaller hospitals and non-healthcare clients;

(b)     that certain customers were delaying their acquisitions; and

(c)     based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company and its business prospects.

40.     On October 14, 2015, after the close of trading, Imprivata issued a release preliminarily announcing its 3Q15 financial results for the interim period started on July 1, 2015, *more than a month before the August 3, 2015 secondary stock offering*, and ended September 30, 2015. Rather than the revenues in the range of $31-$31.5 million that the Company had stated it was on track to achieve in the quarter on July 29, 2015, Imprivata reported that its 3Q15 sales would come in at or below $29.2 million. The 3Q15 loss per share would also come in significantly larger than the ($0.20) the Company had led the market to expect, and would instead come in at between ($0.22) to ($0.23) per share. Based on these disclosures, certain stock analysts took the position that rather than becoming *profitable* in the second half of 2016, as the Company had stated it was on track to achieve on July 29, 2015, Imprivata was now on track to report losses of ($0.25) per share in 2016. Imprivata blamed some of the shortfall on delays in closing deals, now claiming those deals *might* close in the 4Q15. Imprivata also disclosed that sales to non-healthcare customers had

deteriorated significantly.  The Company also disclosed that some smaller providers had held off on additional IT deployments until they gained a level of comfort with the switchover to ICD-10 medical coding, and disclosed that until they got more comfortable with ICD-10, those customers would remain unwilling to buy other software, such as Imprivata's security solution.  The release quoted Defendant Hussain conceding that Imprivata was "disappointed with [the] performance in the third quarter."

41.     On this news, the market price of Imprivata common stock declined precipitously, falling from its close of $17.31 on October 14, 2015 to close down at $12 on October 15, 2015, on unusually high trading volume of almost 4.5 million shares trading, more than 32 times the average daily volume over the preceding ten trading days.

42.     On November 2, 2015, after the close of trading, the Company issued a release disclosing 3Q15 financial results along the same lines preliminarily announced on October 14, 2015. Defendant Hussain opened the conference call held with investors that day affirmatively acknowledging that "[t]his quarter was behind our guidance."  Again claiming the Company would later recover certain lost sales in order to prevent a further free-fall in the Company's price stock, Defendant Hussain stated that "some large deals got delayed due to our customers pushing out large projects such as virtual desktop implementations which tend to precede Imprivata OneSign installations."  Despite Defendant Hussain's efforts to downplay them, the declining revenue growth trends were alarming, as the Company's revenue growth rate, which had already slowed from the mid-30% range in 2014 to below 30% in 2Q15, plummeted to below 15% in the 3Q15.  Moreover, Defendant Hussain also admitted that Imprivata had seen a "slowdown in small hospital purchases which [the Company] believe[d] resulted from industry consolidation concerns and ICD-10," and disclosed that sales in the "non-healthcare business . . . had product bookings below expectations in the third quarter," adding that the Company "now expect[ed] that this segment [would] shrink more quickly as a percentage of . . . revenue."  Indeed, Defendant Hussain finally candidly admitted that the non-healthcare segment would likely never recover, stating, in pertinent part, that "[t]his market has become increasingly commoditized."  Similarly, later in the call, Defendant Hussain admitted

- 13 -

that as to "[t]he trend that we are seeing in the small hospitals, we don't think it's suddenly going to go away come Q4."

43.     During his opening comments on the conference call with investors, Defendant Kalowski confirmed that the sales missed in the 3Q15 would not be picked up in the 4Q15, instead downgrading the Company's financial guidance for the rest of fiscal 2015 and warning that the adverse impacts were continuing into 2016, stating, in pertinent part, as follows:

> We are revising our revenue guidance for Q4 to between $32 million and $34 million.  This reduction is a result of three factors: First, we expect the delays in purchasing our solutions by the smaller-sized hospitals may continue through the end of the year *and into 2016*.
>
> Secondly, given the Q3 fall-off of new product sales in our non-healthcare segment, we are reducing our expectations on sales to these customers. . . .
>
> Similar to our healthcare segment, we are experiencing maintenance renewal rates in excess of 95% with our non-healthcare customers. . . .
>
> Finally, we are forecasting a delay in revenue recognition for our PatientSecure product due to the timing of closing these deals.
>
> *        *        *
>
> Given the updated revenue guidance for Q4, we are now forecasting a loss for Q4 which will result in an annual EBITDA loss of $14.5 million to $13.3 million on annual revenues of between $116.9 million and $118.9 million.

44.     On this news, the price of Imprivata common stock declined further, falling approximately $2 per share from its close of $10.39 per share on November 2, 2015 to close at $9.42 per share on November 3, 2015 on unusually high trading of 770,000 shares trading, more than twice the average daily volume over the preceding ten trading days.

45.     The market for Imprivata common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Imprivata common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Imprivata common stock relying upon the integrity of the market price of Imprivata common stock and market information relating to Imprivata, and have been damaged thereby.

46. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Imprivata common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

47. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Imprivata's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Imprivata and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

48. As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name during the Class Period, were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Imprivata, their control over, and/or receipt and/or modification of Imprivata's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

- 15 -

49.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

50.     Individual Defendants, because of their positions with Imprivata, controlled the contents of the Company's public statements during the Class Period.  Each Defendant was provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, these Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  As a result, each of these Defendants is responsible for the accuracy of Imprivata's corporate statements and are therefore responsible and liable for the representations contained therein.

## LOSS CAUSATION/ECONOMIC LOSS

51.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Imprivata common stock and operated as a fraud or deceit on Class Period purchasers of Imprivata common stock by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Imprivata common stock fell precipitously as the prior artificial inflation came out.

52.     As a result of their purchases of Imprivata common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused Imprivata common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $21.53 per share on August 19, 2015.

53.     By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Imprivata's business and prospects. When the truth about the Company was revealed to the market, the price of Imprivata common stock fell precipitously. These declines removed the inflation from the price of Imprivata common stock, causing real economic loss to investors who had purchased Imprivata common stock during the Class Period.

54.     The declines in the price of Imprivata common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in Imprivata common stock negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Imprivata common stock and the subsequent significant decline in the value of Imprivata common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

55.     At all relevant times, the market for Imprivata common stock was an efficient market for the following reasons, among others:

(a)     Imprivata common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b)     as a regulated issuer, Imprivata filed periodic public reports with the SEC and the NYSE;

(c)     Imprivata regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Imprivata was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

56.     As a result of the foregoing, the market for Imprivata common stock promptly digested current information regarding Imprivata from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Imprivata common stock during the Class Period suffered similar injury through their purchase of Imprivata common stock at artificially inflated prices and a presumption of reliance applies.

### NO SAFE HARBOR

57.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Imprivata who knew that those statements were false when made.

### COUNT I

**Violation of Section 10(b) of
the Exchange Act and Rule 10b-5
Promulgated Thereunder Against Imprivata and the Individual Defendants**

58.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59.     During the Class Period, Imprivata and the Individual Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

60.     These defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

61.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Imprivata common stock.  Plaintiff and the Class would not have purchased Imprivata common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these Defendants' misleading statements.

62.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Imprivata common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants and the Controlling Shareholder Defendants

63.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

64.     The Individual and the Controlling Shareholder Defendants acted as controlling persons of Imprivata within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Imprivata, and their ownership of Imprivata common stock, the Individual Defendants had the power and authority to cause Imprivata to engage

in the wrongful conduct complained of herein.  By reason of their ownership of Imprivata common stock and domination of Imprivata's Board of Directors, the Controlling Shareholder Defendants had the power and authority to cause Imprivata to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual and Controlling Shareholder Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  February 2, 2016                    LAW OFFICES OF ALAN I. KOVACS
                                            ALAN I. KOVACS


                                   _____/s/ Alan L. Kovacs_____
                                            ALAN I. KOVACS
                                   257 Dedham Street
                                   Newton, Massachusetts 02461
                                   Telephone: 617/964-1177
                                   617/332-1223 (fax)
                                   alankovacs@yahoo.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mblasy@rgrdlaw.com

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
600 West Broadway, Suite 1540
San Diego, CA  92101
Telephone:  619/230-0063
619/255-1856 (fax)
FrankJ@JohnsonandWeaver.com

JOHNSON & WEAVER, LLP
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA 30064
Telephone: 770/200-3104
770/200-3104 (fax)
MichaelF@JohnsonandWeaver.com

*Attorneys for Plaintiff*