## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARK HENSLEY, Individually and on Behalf of All Others Similarly Situated, ) | Civil Action No.: 16-CV-10160-LTS |
| ) | |
| ) | CLASS ACTION |
| Plaintiff, ) | |
| ) | **FIRST AMENDED CLASS ACTION** |
| vs. ) | **COMPLAINT** |
| ) | |
| IMPRIVATA, INC., OMAR HUSSAIN, ) | DEMAND FOR JURY TRIAL |
| JEFFREY KALOWSKI, DAVID ORFAO, ) | |
| DAVID BARRETT, PAUL MAEDER, ) | |
| GENERAL CATALYST GROUP II, L.P., ) | |
| HIGHLAND CAPITAL PARTNERS VI ) | |
| LIMITED PARTNERSHIP and POLARIS ) | |
| VENTURE PARTNERS III, L.P. ) | |
| ) | |
| Defendants. ) | |

Lead Plaintiff Mark Hensley ("Lead Plaintiff" or "Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters based on the investigation conducted by and through his attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Imprivata, Inc. ("Imprivata" or the "Company"), Company press releases, media and reports about the Company, and interviews with former employees. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons and entities, other than Defendants, who purchased the securities of Imprivata during the period of July 30, 2015 and November 2, 2015, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws (the "Class"). On behalf of himself and the Class, Plaintiff seeks to

1

recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b), and 20(a) the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its officers and/or directors and various persons who issued knowingly false statements during the Class Period.

2.      Knowingly false financial projections and opinions about future financial performance that omit material facts such that they deprive investors of their full context, are actionable under the federal securities laws.

3.      Imprivata is an IT security and identity solutions company that went public in an IPO in June of 2014.  Focused primarily on software solutions in the healthcare industry, approximately 75% of Imprivata's sales are to the healthcare field (primarily hospitals) and 25% to non-healthcare customers.  No single customer accounts for more than 4% of Imprivata's sales.  Imprivata has operated at a loss since its inception and because Imprivata has only been public for a short period of time, investors are highly focused on results each quarter, as only small changes in quarterly results are greatly indicative of Imprivata's future prospects and its ability to ultimately become a profitable company.

4.      Imprivata's ability to become profitable in the future is highly dependent upon continued demand for its IT solutions.

5.      In addition, Imprivata's success is also dependent on the successful launch of its new product offerings.  On April 30, 2015 Imprivata acquired a company called HT Systems - which makes palm-vein based identification technology - for $19.1 million in cash, a sum equal to about 64% of Imprivata's entire revenue for the second quarter of 2015.  With the acquisition of HT Systems came a product called "PatientSecure," which Imprivata said would enable it to enter the $2 billion dollar patient identification market.

6.      Prior to its IPO, three investment funds General Catalyst Group II, L.P. ("General Catalyst"), Highland Capital Partners VI Limited Partnership ("Highland Capital") and Polaris Venture Partners III, L.P. ("Polaris") (together, the "Controlling Shareholder Defendants") collectively owned a little

over 75% of Imprivata's stock (25.1% each). After Imprivata's IPO, the Controlling Shareholder Defendants continued to collectively own a controlling interest in Imprivata, owning approximately 59% of Imprivata's stock (19.6% each). Partners at each of these three entities had a seat on Imprivata's board of directors, as well as seats on various of Imprivata's board committees.

7.      After the close of business on July 29, 2015 Imprivata delivered its results for the second quarter of 2015 - the one year anniversary since its IPO. The Company's press release emphasized that it had substantially grown revenues and decreased losses year over year, and completed a key acquisition with HT Systems and its PatientSecure product. On a conference call with analysts, Imprivata's CEO Omar Hussain ("Hussain") stated that Imprivata had delivered on all of its growth objectives laid out at the time of the IPO, emphasizing that demand for its products was strong, that its huge sales backlog would support strong sales growth, and that the integration of HT Systems, which was a major step for Imprivata in expanding its product platform, was "going very well" with "tremendous interest in Imprivata PatientSecure from existing customers." The Company also issued its sales forecast for the Third Quarter and Full-Year 2015, *raising* revenue guidance and representing that the Company was on track to becoming profitable by 2016.

8.      Just a few days after announcing these stellar accomplishments and positive prospects, the Company announced, on August 3, 2015, a secondary public offering of 4.35 million shares of common stock by its controlling stockholders and its officers. Pursuant to the secondary public offering General Catalyst, Highland Capital and Polaris sold a total of $68,499,990 of Imprivata stock. Imprivata's CEO, CFO, and other top Imprivata executives also sold an additional $4.193 million in personally held stock over the next two months.

9.      Contrary to the statements Defendants made at the time of the secondary public offering: (i) demand for Imprivata's products was declining, (ii) the HT Systems integration was a disaster, (iii) PatientSecure was a major problem for the Company, and (iv) Imprivata's business was being adversely affected by several factors which were well known to the Company and the Defendants. The situation at

Imprivata was so bad that by the spring of 2015 nearly half of Imprivata's non-healthcare sales force had left or were in the process of trying to leave Imprivata because they were unable to meet their sales quotas, were frustrated with the Company's lack of success, and their commissions were therefore suffering.  In the second quarter of 2015, one former employee in the non-healthcare segment had booked only $100,000 of a $1.2 million sales quota.

10.      Several factors, all of which Defendants were well aware of, were in play at the time Defendants issued their rosy statements about Imprivata's success and prospects and raised revenue guidance for the third quarter, 2015, before unloading their personal holdings in Imprivata stock and pocketing over $72 million.  First, Imprivata's business from non-healthcare customers was completely drying up.  This trend was readily apparent since at least the beginning of 2015.  Second, Imprivata's business from healthcare customers was suffering on several fronts.  Smaller hospitals were not purchasing Imprivata's IT security offerings because of industry consolidation (i.e. smaller hospitals were getting bought by larger hospitals).  In addition, the entire healthcare industry was in a period of major transition with respect to IT solutions because the Department of Health and Human Services instituted a completely new set of standardized codes for medical conditions, diagnoses and procedures to be used for Medicare billing for the first time in thirty five years.  Until hospitals and healthcare providers got up to speed on the transition from ICD-9 coding to the new ICD-10 coding, they would be unwilling and unable to purchase and implement Imprivata's IT products and solutions, since their time and energy- at least with respect to technology and IT- would be completely devoted to working through the many struggles and challenges of transitioning to ICD-10.  Given the government's October 1, 2015 deadline for healthcare providers to transition to ICD-10, the third quarter of 2015 was a particularly inopportune time for hospitals to purchase Imprivata's IT solutions and accordingly, meant Imprivata's sales would likely decline.  Finally, Imprivata discovered that HT Systems' sales pipeline was, in the words of a former high-level Imprivata employee, "completely bogus" and that PatientSecure was a very expensive device which customers had no interest in actually buying

11.      Defendants knew that the Company could not achieve the sales projected in the 3Q 2015

forecast when they issued the forecast and knew that their positive statements about customer demand, growth, and profitability were also false and misleading.   Indeed, Defendants had perfect visibility into the Company's third quarter revenue and knew that their projections were false when made.

12.     After the Controlling Shareholders and Individual Defendants and other insiders sold over $72 million worth of stock to investors at artificially inflated prices, Imprivata announced its preliminary results for the third quarter on October 14, 2015.  Not only were the revenues lower and losses per share significantly larger than those announced in Imprivata's forecast, Imprivata also disclosed that sales of certain anticipated customer purchases got delayed, sales to non-healthcare customers deteriorated significantly and that smaller hospital sales were suffering because of industry consolidation and the switchover to ICD-10.  On this news, the price of Imprivata stock fell 30.6% on massive trading volume of 4.5 million shares (32 times the average daily volume for the 10 days prior), causing damage to investors.

13.     When the Company disclosed the official third quarter 2015 results on November 2, 2015 Defendant Hussain confirmed that the quarter was significantly behind its guidance.  The Company's revenue growth rate, which was in the mid-30% range in 2014, plummeted to below 15% in third quarter. On the Company's earnings conference call Defendant Hussain admitted additional facts revealing that his prior statements were false:  He stated that the non-healthcare segment of the Company's business would likely never recover, and the negative trend of declining sales to smaller hospitals would not improve in the Fourth Quarter. In addition, Imprivata revealed that revenue recognition for PatientSecure would be "delayed" and sales of PatientSecure "did not ramp up as quickly in the third quarter as we had planned." Imprivata downgraded the Company's guidance for the rest of the year and warned that the adverse effects of these issues would continue to negatively impact the Company into 2016.  On this news, Imprivata's share price fell $0.97 per share or 9.3% on unusually high trading volume, causing damage to investors.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78b-1 and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC,

17 C.F.R. §240.10b-5.

15.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

16.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District.  Defendant Imprivata maintains its executive offices and conducts business in this District.

17.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

18.     Lead Plaintiff Mark Hensley, as set forth in the certification filed with his motion for appointment as lead plaintiff, purchased Imprivata securities during the Class Period and has been damaged thereby.

19.     Defendant Imprivata is an IT security company that provides authentication and access management technology solutions for the healthcare and other industries in the United States, the United Kingdom, and internationally. Imprivata common stock is listed and trades on the NYSE, an efficient market, under the ticker symbol "IMPR." As of November 3, 2015, the Company had more than 25 million shares issued and outstanding.

20.     Defendant Omar Hussain ("Hussain") is, and was at all relevant times, the President, Chief Executive Officer ("CEO") and a member of the Imprivata Board of Directors.  Hussain joined Imprivata in 2005 and prior to becoming CEO served as Imprivata's Vice President of Marketing and Operations.

21.     Defendant Jeffrey Kalowski ("Kalowski") is, and was at all relevant times, the Chief Financial Officer ("CFO") of Imprivata.

22.     Defendant General Catalyst Group, II L.P. ("General Catalyst") is a venture capital firm and Delaware limited partnership with its principal business office located at 20 University Road, Cambridge,

MA.  General Catalyst was co-founded by David Orfao.

23.     Defendant David Orfao ("Orfao") is the co-founder of General Catalyst.  Orfao has served as a member of Imprivata's board of directors since 2001 and is a member of both the Board's Audit Committee and Compensation Committee.

24.     Defendant Orfao possessed the power and authority to control the contents of the Company's public filings with the SEC.  He signed Imprivata's Form 10-K for the fiscal year ended December 31, 2015.

25.     Defendant Polaris Venture Partners III, LP ("Polaris Partners") is a private investment partnership and a Delaware limited liability company with its principle business address located at 1000 Winter Street, Waltham, MA.

26.     Defendant David Barrett ("Barrett") is a managing partner of Polaris Partners.  Barrett has served as a member of Imprivata's board of directors since March 2002 and is a member of the Board's compensation committee.

27.     Defendant Barrett possessed the power and authority to control the contents of the Company's public filings with the SEC.  He signed Imprivata's Form 10-K for the fiscal year ended December 31, 2015.

28.     Defendant Highland Capital Partners VI Limited Partnership ("Highland Capital") is a Delaware limited partnership with its principal business office located at One Broadway, Cambridge, MA.  Highland Capital was founded by Paul Maeder.

29.     Defendant Paul Maeder ("Maeder") is a general partner and founder of Highland Capital.  Maeder has served as a member of Imprivata's board of directors since 2002 and is a member of both the Board's nominating committee and corporate governance committee.

30.     Defendant Maeder possessed the power and authority to control the contents of the Company's public filings with the SEC.  He signed Imprivata's Form 10-K for the fiscal year ended December 31, 2015.

31.     General Catalyst, Highland Capital and Polaris are collectively referred to as the "Controlling Shareholder Defendants." The Controlling Shareholder Defendants (and entities affiliated with them) controlled Imprivata, each collectively owning 75.3% (25.1% each) of the Company's stock, prior to Imprivata going public, and continued to control Imprivata owning 58.8% (19.6% each) of Imprivata stock following the Company's July 2014 initial public stock offering (the "IPO").

32.     Hussain, Kalowski, Orfao, Barrett and Maeder are referred to herein, collectively, as the "Individual Defendants."

33.     Imprivata, the Individual Defendants and the Controlling Shareholder Defendants are referred to herein, collectively, as "Defendants."

34.     Each of the Individual Defendants and Controlling Shareholder Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was aware that the false and misleading statements were being issued concerning the Company; and

(f)     approved or ratified these statements in violation of the federal securities laws.

35.     As officers, directors, and controlling persons of a publicly-held company whose common stock is and was registered with the SEC pursuant to the Exchange Act, and was traded on NYSE and governed by the provisions of the federal securities laws, the Individual Defendants and Controlling Shareholder Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's business prospects and operations, and to correct any previously-issued statements

that had become materially misleading or untrue so as to allow the market price of the Company's publicly-traded stock to reflect truthful and accurate information.

36.     Imprivata is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment and with authorization.

37.     The scienter of the Individual Defendants, and other employees and agents of the Company is similarly imputed to Imprivata under *respondeat superior* and agency principles.

## RELEVANT NON-PARTY WITNESSES WITH PERSONAL KNOWLEDGE OF THE RELEVANT ACTIONS AND DEFENDANTS' STATE OF MIND

38.     The allegations made herein are further supported by the first-hand knowledge of five former Imprivata employees ("FEs").  As detailed below, these former employees have direct knowledge about Imprivata's business prior to and during the Class Period and served in positions at Imprivata that provided them with access to the information they are alleged to possess.

39.     FE 1 was a Senior Product Marketing Manager who worked at Imprivata's corporate office in Lexington, Massachusetts.  He worked at Imprivata from November 2014 to April 2015 and reported directly to CEO Omar Hussain.

40.     FE 2 was a sales representative for Imprivata in Lexington, Massachusetts from March 2013 to December 2015.  FE 2 reported directly to the Vice President of North American Inside Sales, Ken Galvin, and was focused on sales to small hospitals and health facilities.

41.     FE3 was the Director of Government and Commercial Sales for Imprivata between November 2013 and January 2016 and reported to the Senior Vice President of World Wide Sales and an Executive Officer of Imprivata, Tom Brigiotta.  Tom Brigiotta directly reported to CEO Hussain, and announced that he would resign effective August 5, 2016 purportedly to accept a senior role in a private company.

42.     FE4 was a regional sales manager at Imprivata from January 2015 through January 2016.

FE4 reported to the Director of Government and Commercial Sales, who in turn reported directly to Tom Brigiotta. FE4's work focused on sales to non-healthcare customers but FE4 had access to and knowledge of information concerning all sales throughout the company via sales reports shared among all sales staff.

43.     FE5 was Imprivata's sales manager for the entire state of Florida from April 2015 through April 2016. FE5 first reported to the Vice President of Worldwide Channel Sales and then to the Vice President of sales for the Southeast, both of whom reported to Tom Brigiotta, who in turn directly reported to Defendant Hussain. FE5 frequently interacted and met with CEO Hussain directly, given Florida's position as a major center of health care in the United States due to its large retiree population. Defendant Hussain would often directly assist FE5 in closing sales to customers and would occasionally travel to Florida to meet with prospective customers of FE5's.

### DUTY TO DISCLOSE KNOWN TRENDS AND UNCERTAINTIES

44.     SEC regulations require that Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") included in a company's quarterly and annual financial statements, such as the MD&A included in the Company's Second Quarter 2015 10-Q filed with the SEC during the Class Period comply with item 303 of Regulation S-K.

45.     SEC Regulation S-K (27 CFR 229.10) requires that every registration statement, annual report or quarterly report contain a "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K. The MD&A requirements are intended to provide material historical and prospective textual disclosures which enable investors and other users to assess the financial condition and results of operations of the company, with particular emphasis on the company's prospects for the future

46.     Item 303 of SEC Regulation S-K (17 C.F.R. 229.303) together with SEC Staff Accounting Bulletin No. 101 required Defendants to disclose in the MD&A section of its registration statement, quarterly reports, and annual reports quarterly filings "unusual or infrequent transactions, known trends, or uncertainties that have had, or might reasonably be expected to have, a[n] . . . unfavorable material effect on

revenue, operating income or net income and the relationship between revenue and the costs of the revenue."

47.     To determine if a transaction, known trend, or uncertainty must be included in the MD&A, the SEC has stated that companies should determine whether a trend, demand, commitment, event, or uncertainty is presently known to management, and whether it is reasonably likely to have a material effect on the registrant's financial condition or results of operations.

48.     The SEC describes the purposes of MD&A in Financial Reporting Release 36 ("FRR 36"):

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future.

> This requirement was reaffirmed in SEC Staff Accounting Bulletin No. 101, Revenue Recognition in Financial Statements, Dec. 1999.

49.     Defendants were required to disclose but did not, in their Second Quarter 2015 10-Q filed during the Class Period, the known trends concerning the decline in demand for Imprivata's products, or more specifically that: (a) demand for the Company's IT solutions had fallen and would continue to fall significantly because customers were delaying their purchases due to the transition to ICD-10 coding; (b) demand for the Company's IT solutions on the part of non-healthcare clients had steeply declined and would likely not recover; (c) demand for the Company's IT solutions on the part of small hospitals had steeply declined and would continue to decline because of industry consolidation as well as the transition to ICD-10 coding; and (d) the integration of HT Systems and demand for its PatientSecure product was proving to be a nightmare, whereby Imprivata learned that HT Systems' purported sales pipeline was "bogus" and customer interest in purchasing PatientSecure was nonexistent.

## SUBSTANTIVE ALLEGATIONS

### Imprivata's Business

50.     Defendant Imprivata was founded in 2001 by entrepreneurs Phil Scarfo and David Ting who

had developed identity management technology while working at Polaroid Corporation's small business incubator.

51.     Imprivata is a software solutions company that went public in an IPO in June of 2014. Imprivata has operated at a loss since its inception.  For example, in 2015 Imprivata incurred a loss of $23.1 million and had an accumulated deficit of $130.6 million.  Imprivata's goal is to become profitable in the future.

52.     Because Imprivata has only been public for such a short time, investors are highly focused on results each quarter, as only small changes in quarterly results are indicative of Imprivata's future prospects and its ability to ultimately become a profitable company.  Imprivata's ability to become profitable in the future is in turn highly dependent upon demand for its IT products and solutions, and its ability to grow its business by acquiring and/or developing new IT products and solutions that customers want to buy.

53.     The Company's flagship product is Imprivata "OneSign," an integrated enterprise single sign-on, authentication management, and workflow automation platform that addresses various security and productivity challenges. OneSign is essentially an IT solution that helps companies manage users' (i.e. mostly their employees and patients) access to their secure work computer servers and files and ensure that nobody impermissibly accesses secure computerized files and records.

54.     Imprivata believes that any healthcare organization that relies on information technology is a potential customer for its solutions.  Imprivata claims that with the widespread adoption of healthcare information technology systems and increasing security and privacy regulations, demand for its solutions has grown.  Because many other industries face security and productivity challenges similar to those in healthcare, Imprivata also sells its products and solutions to non-healthcare organizations, including those in the financial services sector, public sector and other industries.

55.     While a substantial portion of Imprivata's revenue comes from its flagship OneSign solutions product, it has also developed other solutions and products that can be sold together with, or separate from, OneSign. The Company's three other product offerings are: "Cortext", a cloud-based secure

messaging and communications platform that can be used with electronic devices like iPhones, and which is offered as a subscription based service; "PatientSecure" a software based patient identification solution that uses palm vein recognition to allow patients to identify themselves and retrieve their digital health records; and "ConfirmID," a software solution that deals with authentication for electronic prescribing of drugs.

56.     According to Imprivata's SEC filings, Imprivata expected that its Imprivata Confirm ID, Cortext and PatientSecure solutions would begin contributing to its revenue in the near future, but relied on sales of OneSign for a substantial portion of its revenue. Despite not yet contributing to a substantial portion of its revenue, Imprivata was depending on sales of its other solutions as a key to becoming profitable in the future.  Indeed, Imprivata's 2014 10-K states that the Company "ha[s] a history of losses…and [ ]may not be profitable in the future" and goes on to state that its capability to become profitable depends in part on its "Ability to develop and commercialize new solutions and products for those solutions."

57.     An integral part of Imprivata's growth strategy is to broaden its product platform through acquisitions.  Indeed, on April 30, 2015 Imprivata acquired HT Systems and its PatientSecure palm based patient identification system, for $19.1 million.  This represented a very large acquisition for Imprivata given that this amount represents approximately 24.3% of the Company's total cash and cash equivalents and 16.2% of its total assets as of December 31, 2014, as well as 19.7% of its total revenue for the entire 2014 fiscal year.

58.      HT Systems, a Tampa Florida company, is the leading provider of palm vein based biometric patient identification.  Its PatientSecure product which Imprivata acquired is able to distinguish vein patterns in patients' hands and thereby retrieve their correct medical records in a healthcare provider's electronic health record system when a patient checks into a hospital or healthcare provider.  According to Imprivata, this improves patient safety and guards against identify theft and insurance fraud.  Imprivata represented the acquisition of HT Systems as a "major step in expanding [its] identification and authentication platform from providers to patients" and as an opportunity for Imprivata to enter the emerging $2 billion patient identification market.

59.     Imprivata sells it solutions to the healthcare industry and the non-healthcare industry.  Sales in the healthcare industry are to large hospitals and small hospitals (i.e. hospitals with under 200 beds).  Together, the small hospital market and the non-healthcare market comprise 25% of Imprivata's total sales, a material portion of its business.  However, Imprivata does not report revenue on a product-by-product basis or a segment by segment basis.  Accordingly, investors and analysts rely solely on the statements made by Defendants in their SEC filings and investor conference calls concerning the performance of their products and business segments.

### *Important Developments Affecting The Market for Imprivata's Products*

60.     In 2015 the healthcare industry faced a major change with the switchover to the medical code set for medical diagnoses and inpatient hospital procedures used by *all* health care providers for Medicare billing, health insurance and other purposes.  International Classification for Diseases, or "ICD" is used to standardize codes for medical conditions, diagnoses and institutional procedures.  Up until recently, the medical code set used was ICD-9.  ICD-9 had not been updated in 35 years and according to the Department of Health and Human Services, "contained outdated and obsolete terms that are inconsistent with current medical procedure."  On October 1, 2015, the United States officially transitioned from ICD-9 to ICD-10 as the medical code set, meaning that Medicare claims with a date of service on or after October 1, 2015 would only be accepted if they contained a valid ICD-10 code. The switch from ICD-9 coding to ICD-10 coding presented the healthcare community with enormous logistical struggles, and transitioning was expected to be especially difficult for smaller healthcare providers who have fewer resources to deal with this expensive and complicated administrative and technical challenge.  That the transition to ICD-10 coding would take place on October 1, 2015 was well known by those in the healthcare community for some time.  As the Department of Health and Human Services stated in a July 7, 2015 public letter issued to all Medicare Providers, "We understand that moving to ICD-10 is a significant change…"

61.     FE2 explained that because the transition to ICD-10 would take some time to get used to, Defendants knew that the summer and fall of 2015 was a particularly inopportune time for existing customers

to purchase any of Imprivata's newer product offerings as well as for potential customers to invest in Imprivata's flagship OneSign product offering.   FE2 elaborated that because billing is done through a hospital/healthcare provider's IT system electronically, the switchover to ICD-10 would require all hospitals to overhaul or reprogram their existing software and IT systems to account for the new coding and to update patient records accordingly.   Not only was the update to ICD-10 a massive administrative task for hospitals but it was extremely costly and time consuming.   FE2 confirmed that hospitals and healthcare providers would have to completely convert their computer systems before even thinking about investing in Imprivata's security solutions.

62.     Imprivata uses a software program called "Salesforce" to track sales and update forecasts on a constant basis.   All of the FEs interviewed confirmed that Imprivata's Salesforce account showed sales activity as well as sales leads and sales opportunities. The Company's Salesforce account recorded sales leads, sales contacts and final sales orders, which were input by Imprivata's sales personnel, explained FE2. Sales were only booked upon receipt of a purchase order or contract.   Sales leads required the closing of deals at a future time, confirmed FE2.   The Company's Salesforce account was accessible to and monitored by Defendants on a regular basis, especially stated FE4, given the small size of the Company and the ability to easily "click on a tab" in the Company's Salesforce software account and see all employees' sales and sales forecasts.   The Individual Defendants were also hands-on managers who regularly attended sales meetings and monitored sales by viewing the Company's Salesforce account, stated FE3.

63.     The Company's Salesforce account provided FE4 access to Imprivata's product and solutions sales data to customers in both the healthcare and non-healthcare segments.   FE4 reports that it was readily apparent by looking at the Company's sales in its Salesforce account that sales in the Company overall were declining during 2015.   FE4 stated that internally, employees regarded the Company as struggling to make sales and that he and many other employees believed that Imprivata did not have enough sales revenues or business in its sales pipeline to have gone public in the first place.

64.     According to FE2, who worked with Imprivata's Salesforce software account on a daily

basis, and was able to see sales activity for the entire Company, from late 2014 to 2015 many small hospitals were merging with larger hospitals and the financial stress to small hospitals and concomitant decrease in demand for Imprivata's products was well known to the Company and its management, including specifically Defendants Hussain and Kowalski.  FE2 explained that because small hospitals were unsure of who their future owner would be and what its IT preferences were, small hospitals were understandably hesitant to invest in any IT products.

65.     FE2 also reported that numerous potential Imprivata customers informed sales representatives that as much as they might like to invest in Imprivata's security products they would simply have no money to buy them because their budgets were consumed by the need to deal with the government's mandate that all reimbursed healthcare providers convert their computer systems to use ICD-10 coding for medical diagnoses.  The fact that the transition to ICD-10 was a major impediment to Imprivata's sales, became well known to Defendants Hussain and Kowalski in early 2015.

66.     According to FE2, when Defendants issued their Q3 2015 sales forecast in July of 2015, there was absolutely no sales backlog.  Sales of Imprivata's flagship product, OneSign did not require long lead times because OneSign and its related authentication devices work with an existing hospital IT application.  Rather than requiring long lead times, sales would occur rapidly and immediately.  Delivery and deployment of Imprivata's products occurred within a week or months of a sale.  FE2 explained that long lead times for sales were not an issue for Imprivata: instead the struggle was making the sale in the first place.

67.     Given the transition to ICD-10, and the prevalence of hospital mergers, FE4 noted Imprivata sales staff rarely achieved their sales quotas.

68.     According to FE1, Defendant Hussain in particular was extremely involved in the Company's marketing efforts and regularly attended marketing meetings with FE1.  Hussain was well aware that industry consolidation and the changeover to ICD-10 coding would have a negative effect of Imprivata's sales.  FE5 also confirmed that impediments to Imprivata's revenue growth became well known to

Defendants prior to their issuance of the 3Q forecast

### The Complete Decline in Imprivata's Non-Healthcare Sales

69.     Defendants were also well aware of the steep decline in the Company's non-healthcare sales prior to issuing the 3Q forecast.  According to FE3, who reported directly to Imprivata executive Tom Brigiotta, who in turn reported directly to Defendant Hussain, Imprivata's non-healthcare sales were a complete failure throughout all of 2015.  This was well-documented in the Company's Salesforce account, which was accessible to and reviewed by Defendants Hussain and Kowalski, noted FE3.

70.     According to FE4, Salespeople in the non-healthcare segment were extremely frustrated because they were given no support. Salespeople in the non-healthcare segment were even forced to develop their own sales literature. These frustrations as well as the lack of sales were reported directly to Brigiotta, who in turn reported this to Hussain and Kowalksi, confirmed FE4.

71.     FE4 stated that by the spring of 2015 half of the sales force in the non-healthcare segment had left the Company, frustrated with its lack of success and sales.  The massive decline in the non-healthcare sales segment was readily known by the Individual Defendants who, according to FE4, were able to see the differential between the sales quotas as opposed to the sales results in the Company's Salesforce account. For example, in the Second Quarter of 2015, FE4 had booked only $100,000 of a $1.2 million sales quota. FE4 reports that the entire non-healthcare sales department was eliminated in January 2016 and Imprivata simply ended all of its efforts to sell outside of the healthcare market.

### Imprivata's New Product Failures and Costly and Disastrous Acquisition

72.     Sales and customer feedback concerning new product offerings were also not going well. For example, FE1, who reported directly to CEO Hussain, and focused exclusively on marketing Imprivata's ConfirmID product, reports that ConfirmID was simply not selling.  By April 2015, only 25-30 units were sold.  Hussain, who was very involved in marketing and regularly met with FE1 to discuss marketing efforts and review sales of ConfirmID directly with FE1 was well aware that ConfirmID was not selling, reported FE1.  Indeed, FE1 described Hussain as definitively being a "marketing guy" who was very hands on in

terms of having executive marketing meetings and focusing on marketing.

73.     As for Imprivata's PatientSecure, product, which it had acquired via the April 30, 2015 HT Systems acquisition, the product and the acquisition proved to be a complete nightmare.

74.     According to FE5, who managed sales of all of Imprivata's products to Florida's huge healthcare industry and had frequent interactions with Defendant Hussain as well as with Imprivata's chief of sales Brigiotta, PatientSecure was a very high-tech product: it read the vein pattern in a person's palm and was considered a foolproof identification system since no two people's palm veins are exactly alike.

75.     Imprivata purchased HT Systems and its PatientSecure product for $19.1 million.  Imprivata paid such a hefty price for HT FE5 explained, not simply for its PatientSecure product but for the pipeline of HT's many sales prospects who were supposedly interested in buying PatientSecure.

76.     FE5 attested that when HT Systems' staff and business were merged with Imprivata beginning in April 2015 Imprivata began to discover that HT Systems' sales pipeline did not consist of customers who were in any way committed to purchasing anything, or who were even solid sales leads, and was grossly exaggerated.  Defendants discovered that HT Systems' purported sales pipeline was based on casual contacts or prospective customers who HT had made initial contact with but who never demonstrated any level of commitment to buying PatientSecure. FE5 reported that in purchasing PatientSecure and HT Systems, Imprivata banked on that fact that customers in HT's pipeline would close deals on PatientSecure but discovered that the prospective customers had not even *seen* the device, much less agreed to purchase it or even study purchasing it.   In short, the sales pipeline was false.

77.     FE5 described this situation as a "nightmare" where Imprivata sales staff went through all of HT's pipeline of customers purportedly ready to buy PatientSecure only to discover that the sales pipeline was what FE5 called "bogus."  In fact, a former HT Systems senior vice president, Tripp Winn, told FE5 directly "that the pipeline was bogus."

78.     FE5 stated that Defendant Hussain in particular was keenly aware that the acquisition of HT Systems and PatientSecure was a disaster by at least the beginning of July of 2015.  In fact FE5 had frequent

conversations with Hussain, who specifically traveled to Florida (along with Tom Brigiotta) to accompany her to client meetings on larger deals and assist her in closing sales, and confirmed that all of the top executives at Imprivata were fully aware of the disastrous miscalculation concerning the HT acquisition and PatientSecure (i.e. that in acquiring HT Imprivata had spent a tremendous amount of cash in reliance on a sales opportunity that did not exist and for a product that customers were not interested in buying) at least by the beginning of July of 2015.

79.    FE5, like all other Imprivata employees, recorded all of her work, including sales prospects and sales in the Company's Saleforce account and said that forecasting was very strict and that Defendants Hussain and Kowalski constantly monitored sales forecasts through Salesforce to see if they were in line with targets.  FE5 stated that, as of July 2015, Imprivata had not booked any significant sales of PatientSecure.

80.    Asked about Hussain's July 2015 statement to investors that described HT Systems as a "key acquisition" and that "we have driven growth both through the acquisition of new customers and strong add-on business to our existing customers" and his touting Patient Secure as "solidify[ing] our leadership as a security platform, FE5 remarked that she could not say what Hussain was thinking when he made those statements, because he knew that Imprivata's growth was significantly hampered at the time by pressures on healthcare IT budgets in 2015 and major competition from other security providers, and was well aware of the fact that the HT acquisition was a "nightmare" for Imprivata and that customers were not interested in buying the Patient Secure product.  FE5 attributed Hussain's knowingly false statements to his personal greed, describing him as constantly exhibiting a fascination with, and desire for, wealth, and frequently making inappropriate comments concerning his personal wealth and financial situation at client dinners, such as when he stated "you have to hit my quota so I can buy my Manhattan apartment" and his constant complaining about the fact that he had lost so much money in his 2014 divorce.

81.    Thus, before Defendants disclosed Imprivata's July 29, 2015 revenue forecast, they had complete knowledge of the facts that would negatively impact revenue and growth in the third quarter of

2015 and beyond.   They also knew that the HT Systems acquisition was disastrous and interest in PatientSecure was practically nonexistent, and that in acquiring HT Systems the Company had made a $19.1 million mistake.

## <u>DEFENDANTS' FALSE AND MISLEADING STATEMENTS</u>

82.     The Class Period starts on July 30, 2015. On July 29, 2015, after the close of trading, Imprivata issued a press release announcing its financial results for its 2015 second quarter, the period ended June 30, 2015 ("2Q15"). The release emphasized that Imprivata had substantially grown revenues and significantly decreased losses year-over-year.  The release press also provided the following "Third Quarter and Full-Fiscal 2015 Financial Outlook," that the Company was purportedly then on track to achieve:

> For the full-year, **we expect revenue between $124.0 million and $126.0 million** and Adjusted EBITDA to be between **a loss of $10.0 million and $8.5 million.** In terms of earnings per share, we expect GAAP loss to be between $(0.82) per share and $(0.76) per share and non-GAAP net loss, which adjusts for stock-based compensation, amortization of purchased intangible assets, transaction costs associated with business acquisitions, transaction costs associated with offerings of our common stock and the contingent liability revaluation, to be between $(0.60) per share and $(0.54) per share. Our annual EPS estimates are based on an estimated weighted average-share count of 24.2 million.

> For the third quarter, **we expect revenue between $31.0 million and $31.5 million** and Adjusted EBITDA to be **between a loss of $4.2 million and $3.9 million.** In terms of earnings per share, we expect GAAP loss to be between $(0.27) per share and $(0.25) per share and non-GAAP net loss, which adjusts for stock-based compensation, amortization of purchased intangible assets, transaction costs associated with business acquisitions, transaction costs associated with offerings of our common stock and the contingent liability revaluation, to be between $(0.22) per share and $(0.20) per share. Our third quarter EPS estimates are based on an estimated weighted average-share count of 24.3 million.

> In addition, the press release falsely touted the success of the acquisition of HT Systems and its PatientSecure product:

> "***We have…completed a key acquisition***.  We have driven growth both through the acquisition of new customers, and strong add on business to our existing customers.  I am especially excited about the launch of our PatientSecure product…***PatientSecure will solidify our leadership as a securities platform for healthcare***…"

83.     The third quarter and full year 2015 revenue forecast in the preceding paragraph was materially false and misleading and/or contained material omissions because Defendants knew the following:

(a)        demand for the Company's IT solutions had dramatically declined and would continue to fall significantly because  customers were delaying their acquisitions of IT solutions due to the transition to ICD-10 coding;

(b)        demand for the Company's IT solutions on the part of non-healthcare clients had steeply declined and would likely not recover because of competition from other security providers, who, unlike Imprivata, devoted marketing resources to customers in the non-healthcare segment and because half of Imprivata's non-healthcare sales staff had left the Company;

(c)        demand for the Company's IT solutions on the part of small hospitals had steeply declined and would continue to decline because of industry consolidation as well as the transition to ICD-10 coding;

(d)        As such, Defendants knew that Imprivata would not achieve its third quarter and full year 2016 revenue forecast, at the time Defendants disclosed it.

84.        In addition, the statements in 82-83 above concerning the acquisition of HT Systems and the launch of the PatientSecure product were false and misleading because Defendants knew that the HT Systems sales pipeline was grossly exaggerated and that the PatientSecure product was not something that HT's purported prospective customers were in fact going to purchase.

85.        Later that afternoon, Imprivata held a conference call with analysts and investors to discuss the Company's earnings and operations and third quarter and full year forecast. During the conference call, Defendant Kalowski emphasized that Imprivata was then experiencing very strong demand for its product offerings, which he claimed, that along with its huge sales backlog, would support the strong sales growth Defendants were forecasting for the 3Q15, stating, in pertinent part, as follows:

> In Q2, we experienced this for the first time, as some customers purchased Imprivata Confirm ID together with Imprivata OneSign. The deferred revenue is included in our backlog and will be recognized over the next year. **We are seeing increased demand for our subscription products and I want to point out that as we cross-sell our subscription-based products, we expect this trend to continue**. That said, bookings are unaffected and our forward guidance anticipates this.

Our total backlog, including deferred revenue from our balance sheet, increased to $42.9 million at the end of the second quarter, an increase of $2.2 million from Q1.

**We anticipate recognizing revenue of approximately $26.8 million from the backlog over the course of 2015, $17.5 million of which is maintenance revenue.**

86.     Indeed, Defendant Kalowski stated that the strong performance justified raising revenue guidance for fiscal 2015 and represented that the Company was then on track to becoming profitable by 2016, stating, in pertinent part, as follows:

Finally, I want to review our 2015 financial outlook. We are narrowing our revenue range for full-year 2015 **by raising the low end of the range from $123.5 million to $124 million.** Our new range is $124 million to $126 million.

Historically, we have seen significantly higher revenues in the fourth quarter, **and as a result we are forecasting an EBITDA profit in Q4.**

87.     Defendant Kalowski's above statements in ¶¶ 85-86 were materially false and misleading and/or contained material omissions because Defendant Kalowski knew that demand for the Company's IT solutions had fallen and would continue to fall significantly because customers were delaying their acquisitions due to the transition to ICD-10 coding; that demand for the Company's IT solutions on the part of non-healthcare clients had steeply declined and would likely not recover; that demand for the Company's IT solutions on the part of small hospitals had steeply declined and would continue to decline because of industry consolidation as well as the transition to ICD-10 coding; and that as such Imprivata would not achieve its third quarter and full year 2015 revenue forecast.

88.     During the Q&A portion of the conference call, Defendants also touted the acquisition of HT Systems and PatientSecure, and fielded questions from analysts, reassuring them that interest for PatientSecure was high and that the acquisition of HT Systems was going well:  In response to an analyst's question whether "anything [had] changed since [the] IPO" in terms of market "expectations," Defendant Hussain further emphasized the strong demand the Company was purportedly then experiencing, stating, in pertinent part, as follows:

*An integral component of Imprivata's growth strategy is to broaden our platform through acquisitions.* During the quarter we completed the acquisition of HT Systems a leading provider of palm vein biometric, patient identification solutions. Their solution allows

hospitals to improve patient engagement and safety, reduce enrollment time and eliminate duplicate medical records and prevent identity theft and insurance fraud. ***Acquisition of HT Systems is a major step in expanding our identification and authentication platform from providers to patients.***

\*\*\*

I am pleased to say that the integration is going very well.

\*\*\*

Since our announcement of the acquisition we have seen tremendous interest in Imprivata Patient Secure from our existing customers.

89.     When asked by an analyst "So on the HT Systems can you just give us any kind of early read on the integration efforts there" Hussain responded, "Well, the integration is going on plan, on target…"

Defendant Hussain's statements in ¶¶88-89 above concerning the HT Systems acquisition and PatientSecure were materially false and misleading and/or contained material omissions because Defendants knew that the integration was not "on target" but was instead a complete nightmare where HT Systems' entire sales pipeline proved to be "bogus" and that there was no interest in purchasing PatientSecure either by existing customers or by supposed customers obtained through the HT Systems acquisition.

90.     In its Second Quarter 10-Q, the Company included the following relevant risk disclosures:

Developments in the healthcare industry or regulatory environment could adversely affect our business.

Our growth strategy is focused on the healthcare industry and a substantial portion of our revenue is derived from the healthcare industry. This industry is highly regulated and is subject to changing political, legislative, regulatory and other influences. ***Developments generally affecting the healthcare industry, including new regulations or new interpretations of existing regulations, such as reductions in funding, changes in pricing for healthcare services or impediments to third-party reimbursement for healthcare costs, may cause deterioration in the financial or business condition of our customers and cause them to reduce their spending on information technology.*** As a result, these developments could adversely affect our business.

In March 2010, comprehensive healthcare reform legislation was enacted in the United States through the Patient Protection and Affordable Health Care for America Act and the Health Care and Education Reconciliation Act. This law has increased health insurance coverage through individual and employer mandates, subsidies offered to lower income individuals, tax credits available to smaller employers and broadening of Medicaid eligibility, and to affect third-party reimbursement levels for healthcare organizations. We cannot predict what effect federal healthcare reform or any future legislation or regulation, or healthcare initiatives, if any, implemented at the state level, will have on us or our healthcare customers.

In addition, our healthcare customers' expectations regarding pending or potential industry developments may also affect their budgeting processes and spending plans with respect to our solutions. The healthcare industry has changed significantly in recent years and we expect that significant changes will continue to occur. However, the timing and impact of developments in the healthcare industry are difficult to predict. We cannot assure you that the markets for our solutions will continue to exist at current levels or that we will have adequate technical, financial and marketing resources to react to changes in those markets.

91.     The foregoing risk disclosures were materially false and misleading, and, therefore, not sufficiently specific or meaningful, because Defendants knew but failed to disclose that the imminent transition by Imprivata's healthcare customers to ICD-10 would take place on October 1, 2015 and severely diminish demand for its products.  During the Third Quarter 2015 earnings conference call Defendants admitted but failed to disclose the risks related to its revenue forecast that ICD-10 would cause a decreased demand for its products and slowdown in growth.

92.     On July 1, 2015, the Company filed a Registration Statement on Form S-3 with the SEC registering more than 13 million shares for resale by certain unidentified "Selling Stockholders." Imprivata utilized a "shelf registration", or continuous offering process. The Registration Statement expressly incorporated by reference certain Imprivata SEC filings and all future filings until the date of any offering conducted under the shelf registration statement was completed. On July 15, 2015, the SEC declared the Registration Statement effective.

93.     On August 3, 2015, Imprivata announced that it was commencing an underwritten secondary public offering of up to 4.35 million shares of common stock held by existing stockholders and filed a preliminary prospectus supplement with the SEC pursuant to Rule 424(b)(7).  On August 6, 2015 Imprivata filed a prospectus supplement with the SEC pursuant to Rule 424(b)(7), dated August 5, 2015. The preliminary prospectus supplements supplemented the Registration Statement on Form S-3 filed with the SEC on July 1, 2015, as set forth in the preceding paragraph, which registered more than 13 million shares of Imprivata stock for resale by certain unidentified "Selling Stockholders." The foregoing prospectus supplements (as well as the July 1, 2015 Registration Statement) incorporated by reference Imprivata's prior SEC filings, including the Company's Second Quarter 10-Q and the Company's Form 8-K filed on July 29,

2015 containing Imprivata's third quarter and full year 2015 financial forecast. Hussain, Kalowski and the Controlling Shareholders sold over $72 million of Imprivata stock in this offering, as further described below.

### Impact of the Foregoing Misrepresentations on Analysts

94.    Defendants' misleading statements concerning their stellar growth and false third quarter and full year 2015 forecast had convinced investors and analysts to raise their expectations for Imprivata's financial performance and its share price. For example, on August 17, 2015 JP Morgan upgraded Imprivata to an overweight rating[1] and set a price target of $24.00 stating:

> Following a period of restriction, we are moving to an Overweight rating and December 2016 price target of $24 from a Not Rated designation. We view the need for security in healthcare as a multi-billion dollar opportunity with IMPR as a leader.
>
> The June quarter saw twice the increase in revenue sequentially as the increase in expenses. This is evidence, in our opinion, that operating leverage is kicking in…The majority of revenue still comes from the OneSign Single Sign On (SSO) solution, *but we believe ePrescription and the new Patient Secure patient authentication products are growing much faster off a small base*. We believe the benefits of both are becoming increasingly clear to providers, and in the case of ePrescription regulations, as seen the state of NY, for example, are driving demand for prescription of controlled substances.
>
> The June quarter results are a key milestone as the total expenses increased $2.1M sequentially, while revenue was up $4.4M. We believe this is the start of the operating leverage inflection that will carry the company ultimately to a target model with EBITDA margins of 20%+
>
> Imprivata has around 1,000 US hospital customers and over 200 international hospital customers. *In addition, the company sells to 450 customers outside of healthcare*, through healthcare represents ~75% of customers.
>
> ***
>
> "Authentication Outside of Healthcare Offers $3B Incremental Opportunity. While ~75% of Imprivata's customers are healthcare companies, the other 25% come from other industries that tend to be highly regulated, such as financial services. At the point Imprivata begins to saturate high growth potential of healthcare, we see the potential for the company to penetrate another $3 billion of authentication opportunity in other industries."

95.    Analysts were especially impressed with Imprivata's acquisition of HT Systems and

---

[1] An overweight rating indicates that "over the next six to twelve months, we expect this stock will outperform the average total return of stocks in the analyst's (or the analyst's team's) coverage universe. The overweight rating falls into a buy rating category."

PatientSecure and the $2 billion market opportunity it presented.  JP Morgan Analyst Sterling Auty noted that "during 1Q15 earnings call, management outlined how they saw the PatientSecure solution addressing a market that's potentially $2B in size" and that "at the time of the acquisition, it was noted that HT Systems' PatientSecure offering was used across 65 healthcare systems of more than 350 hospitals and thousands of clinics."

96.     Defendants' misrepresentations caused an increase in the price of Imprivata stock.  On July 29, 2015, Imprivata stock closed at a price of $15.26 per share.  On August 18, 2015, the day following JP Morgan's upgrade of Imprivata to a target of $24, Imprivata stock closed at a price of $21.00, a 27.3% price increase since the day preceding the start of the Class Period.

## THE TRUTH IS REVEALED

97.     On October 14, 2015, after the close of trading, Imprivata issued a press release filed a Form 8-K filed with the SEC announcing its 3Q15 financial results for the interim period started on July 1, 2015, more than a month before the August 3, 2015 secondary stock offering, and ended September 30, 2015. Rather than the revenues in the range of $31-$31.5 million that the Company had stated it was on track to achieve in the quarter on July 29, 2015, Imprivata reported that its 3Q15 sales would come in at or below $29.2 million. The 3Q15 loss per share would also come in significantly larger than the ($0.20) the Company had led the market to expect, and would instead the Company would lose between ($0.22) to ($0.23) per share.  Defendant Hussain blamed the shortfall on three factors:  "First we had a few large deals get delayed due to customer implementation schedules and available IT resources...Second, in our non-healthcare segment, we saw a decline in product sales as several deals did not close. Our non-healthcare sales have decelerated faster than expected, and we now anticipate that non-healthcare sales will continue to be a smaller portion of our business. Lastly, sales to smaller hospitals were below our plan. Some of these potential customers are pushing out their purchases as they grapple with going live with ICD-10 and potential effects of mergers and acquisitions in this segment of the hospital market."  Hussain further stated "We are disappointed with our performance in the third quarter..."

98.    On this news, the market price of Imprivata common stock declined precipitously, falling from its close of $17.31 on October 14, 2015 to close down at $12 on October 15, 2015, on unusually high trading volume of almost 4.5 million shares trading, more than 32 times the average daily volume over the preceding ten trading days.

99.    Following Imprivata's October 14, 2015 preliminary release of its earnings analyst JP Morgan downgraded the stock to neutral, noting that three factors led to the shortfall.  "First, a couple of large single sign on (SSO) deals slipped out of the quarter.  Second, non-healthcare business fell off faster than anticipated.  Third, smaller hospitals delayed purchasing as they deal with the potential M&A and going live with IDC-10, the updated code set for medical diagnosis and procedures."   JPMorgan noted the magnitude of the shortfall stating:  "Lingering effects have us lowering growth outlook "[G]iven the magnitude of the shortfall, concern that small hospital demand could take time to recover, and non-healthcare business is fading…The company's 3Q '15 preannouncement gives us pause as we do not have clarity on whether the factors that led to the disappointing results will persist, and to what degree."

100.    Defendants confirmed the Company's disappointing third quarter results and revealed additional details concerning the shortfall two weeks later.  On November 2, 2015, after the close of trading, the Company issued a release disclosing final 3Q15 financial results along the same lines preliminarily announced on October 14, 2015.

101.    On November 2, 2015 during the third quarter, 2015 Earnings Conference Call Defendants Hussain and Kowalski explained the reasons for the revenue forecast miss.  In doing so, they contradicted their own previous statements, ignored information of which they were aware, and pretended to state as new information facts that which they knew as facts months earlier.

102.    Defendant Hussain opened the conference call held with investors that day affirmatively acknowledging that "[t]his quarter was behind our guidance." Again claiming the Company would later recover certain lost sales in order to prevent a further free-fall in the Company's price stock, Defendant Hussain stated that "some large deals got delayed due to our customers pushing out large projects such as

virtual desktop implementations which tend to precede Imprivata OneSign installations." Despite Defendant Hussain's efforts to downplay them, the declining revenue growth trends were alarming, as the Company's revenue growth rate, which had already slowed from the mid-30% range in 2014 to below 30% in 2Q15, plummeted to below 15% in the 3Q15.

103.     Moreover, Defendant Hussain also admitted that Imprivata had seen a "slowdown in small hospital purchases which [the Company] believe[d] resulted from industry consolidation concerns and ICD-10," and disclosed that sales in the "non-healthcare business . . . had product bookings below expectations in the third quarter," adding that the Company "now expect[ed] that this segment [would] shrink more quickly as a percentage of . . . revenue." Indeed, Defendant Hussain finally candidly admitted that the non-healthcare segment would likely never recover, stating, in pertinent part, that "[t]his market has become increasingly commoditized." Similarly, later in the call, Defendant Hussain admitted that as to "[t]he trend that we are seeing in the small hospitals, we don't think it's suddenly going to go away come Q4." When pressed by an analyst concerning the Company's historical target 25% growth rate Hussain tried to remain non-committal- stating "I think it's too early to really say anything because we haven't done the 2016 planning process yet…*We have concerns about growth in the small hospital market. We don't know whether it was a surprise to us on how much behind plan they were. But significantly behind plan they were this quarter and the non-healthcare, we don't know how fast it will shrink.* I think over the next quarter, Sean as we flush out Q4 and see what happen, we will get a better sense. *But clearly, a component of our growth for next year is going to be affected because, these two components comprise roughly 25% of our overall revenue number.*

104.     Defendant Hussain failed to admit however, that he knew full well that the transition to ICD-10 and the looming October 1, 2015 deadline for the switchover would consume hospitals' budgets and attention- particularly smaller hospitals, leaving them without the money or the time to allocate towards purchase Imprivata's products – causing a significant decline in sales.  Hussain also failed to admit that he knew no later than *the <u>beginning of July</u> of 2015 and before Defendants raised their third quarter guidance,*

that the Company's non-healthcare sales were falling off at alarming levels, given that over half of the non-healthcare staff had left the Company, and that sales representatives were hitting only a tiny fraction of their targets.

105.    Finally, Individual Defendants Hussain and Kowalski admitted that there would be a "delay in revenue recognition for our PatientSecure product due to the timing of the closing of these deals and that "sales did not ramp up as quickly in the third quarter as we had planned."   But neither Hussain nor Kowalski mentioned that they had direct knowledge prior to July 29, 2015 that the entire PatientSecure sales pipeline acquired from HT Systems was grossly exaggerated and that the purported customers it claimed were in its pipeline were nowhere near committed to purchasing PatientSecure.

106.    Indeed, on the call Defendant Kalowski confirmed that the sales missed in the 3Q15 would not be picked up in the 4Q15, instead he downgraded the Company's financial guidance for the rest of fiscal 2015 and warning that the adverse impacts were continuing into 2016, stating, in pertinent part, as follows:

> We are revising our revenue guidance for Q4 to between $32 million and $34 million. This reduction is a result of three factors: First, we expect the delays in purchasing our solutions by the smaller-sized hospitals may continue through the end of the year *and into 2016.*
>
> Secondly, given the Q3 fall-off of new product sales in our non-healthcare segment, we are reducing our expectations on sales to these customers. . . .
>
> Finally, we are forecasting a delay in revenue recognition for our PatientSecure product due to the timing of closing these deals.
>
> \*     \*     \*
>
> Given the updated revenue guidance for Q4, we are now forecasting a loss for Q4 which will result in an annual EBITDA loss of $14.5 million to $13.3 million on annual revenues of between $116.9 million and $118.9 million.

107.    On this news, the price of Imprivata common stock declined further, falling approximately $2 per share from its close of $10.39 per share on November 2, 2015 to close at $9.42 per share on November 3, 2015 on unusually high trading of 770,000 shares trading, more than twice the average daily volume over the preceding ten trading days.

108.    Industry analysts reacted harshly to Imprivata's announcement of its missed revenue target. JPMorgan downgraded Imprivata stock to neutral.  Sterling Auty of JPMorgan noted that "lingering effects

have us lowering growth outlook..[G]iven the magnitude of the shortfall concern that small hospital demand could take time to recover, and non-healthcare business is fading….unfortunately management expects many of the issues that led to the pre-announcement to persist into next year, namely hospital consolidation, delays owing to ICD-10, and a decline in non-healthcare sales."

109.    The Street.com analyst Linsday Graham remarked that earnings per share declined 10% in the third quarter 2015 compared to the same quarter a year ago, that net income significantly decreased by 52.8% compared to the same quarter a year ago and that "regardless of Imprivata's high profit margin, it has managed to decrease from the same period last year."

### Defendants' Insider Sales

110.    Between August 3, 2015, just five days after making their July 29, 2015 false and misleading statements and omissions, and October 13, 2015, the day before the corrective disclosure, Defendants Hussain and Kalowski and the Controlling Shareholder Defendants, and other Imprivata top executives and directors suspiciously sold their personally held Imprivata stock *for proceeds of over $72.69 million*. The timing of Defendants' sales demonstrates that they knew, that, *inter alia*, demand for the Company's products had fallen significantly with respect to small hospitals and customers in the non-healthcare segment (which historically accounted for 25% of Imprivata's sales), that the transition to ICD-10 would negatively affect sales, that the acquisition of HT Systems and PatientSecure was a costly mistake, and that the positive statements made in the Company's July 29, 2015 8-K forecasting results for the third quarter and full year 2015 were false.

111.    The fraudulent scheme also significantly benefitted the Controlling Shareholder Defendants. The Controlling Shareholder Defendants controlled Imprivata, each collectively owning 75.3% (25.1% each) of the Company's stock,  prior to Imprivata going public, continued owning 19.6% of Imprivata equity each following the Company's July 2014 initial public stock offering (the "IPO"). The Controlling Shareholder Defendants collectively owned a controlling interest in Imprivata following the IPO, and General Catalyst Managing Director David Orfao, Highland Capital founder and General Partner Paul

Maeder, and Polaris Managing Partner David Barrett all continued serving as members of the Imprivata Board of Directors following the IPO. The Controlling Shareholder Defendants benefitted from the fraudulent scheme by unloading for a total of $68,499,990 collectively of Imprivata stock to investors at artificially inflated prices pursuant to the August 5, 2015 secondary offering. The Company did not receive any proceeds from the sale of stock but nevertheless was required to pay the expenses in connection with the Controlling Shareholders' offering, totaling approximately $600,000. The Controlling Shareholder Defendants' insider sales were suspicious in amount and timing in light of the fact that none of them had sold any shares since the Company's IPO.

112.   The following chart describes the insider sales:

| Seller | Date Sold | Shares Sold | Price | Proceeds |
|---|---|---|---|---|
| **Deft. Hussain** | 8/11/15 | 40,000 | $18.13 | $725,200 |
| | 8/17/15 | 15,000 | $19.64 | $294,600 |
| | 9/15/15 | 15,000 | $19.98 | $299,700 |
| | | | | **$1,319,500** |
| **Deft. Kalowski** | 8/3/15 | 7,000 | $14.87 | $104,090 |
| | 8/11/15 | 12,000 | $18.13 | $217,560 |
| | 9/1/15 | 8,639 | $20.07-$20.08 | $173,465 |
| | 10/1/15 | 5,000 | $17.27 | $86,350 |
| | 10/12/15 | 100 | $18.00 | $1,800 |
| | 10/13/15 | 900 | $18.01 | $16,209 |
| | | | | **$599,474** |
| **David Ting** Founder, chief Technology Officer and Director | 8/3/15 | 2,237 | $15.03 | $33,622 |
| | 8/4/15 | 1,763 | $15.01 | $26,463 |
| | 8/5/15 | 2,000 | $16.01 | $32,020 |
| | 8/10/15 | 10,771 | $17.11 | $184,292 |
| | 8/12/15 | 18,000 | $19.01 | $324,180 |
| | 9/1/15 | 11,000 | $20.08-$20.09 | $220,910 |
| | 10/1/15 | 8,000 | $17.27-$17.48 | $138,580 |
| | | | | **$978,067** |
| **Thomas Brigiotta** | 8/3/15 | 2,797 | $15.03 | $42,039 |
| | 8/4/15 | 2,203 | $15.01 | $33,067 |
| | 8/17/15 | 20,000 | $19.98 | $399,600 |

| Seller | Date Sold | Shares Sold | Price | Proceeds |
|---|---|---|---|---|
| Sr. VP Worldwide Sales & Field Operations | 9/1/15<br>9/2/15<br>10/2/15 | 639<br>10,000<br>5,000 | $20.07<br>$19.23<br>$16.68 | $12,825<br>$192,300<br>$83,400<br>**$763,231** |
| **Christopher Shaw** Senior VP, GM OneSign Products Group | 8/17/15<br>9/1/15<br>9/15/15 | 22,000<br>639<br>4,000 | $19.64-$20.04<br>$20.07<br>$19.98-$20.00 | **$440,080**<br>**$12,825**<br>**$79,960**<br>**$532,865** |
| **Highland Capital** | 8/5/15 | 1,450,000 | $15.00 | **$21,750,000** |
| **Polaris** | 8/5/15 | 1,450,000 | $15.00 | **$21,750,000** |
| **General Catalyst** | 8/5/15 | 1,666,666 | $15.00 | **$24,999,990** |
| TOTALS | | 4,791,354 | | **$72,693,127** |

## NO SAFE HARBOR

113.    Imprivata's "Safe Harbor" warnings accompanying its reportedly forward looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor. *See* 15 U.S.C. §78u- 5(b)(2)(A).

114.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Imprivata who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic

or present tense statements when made.

## **LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS**

115.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Imprivata securities during the Class Period that suffered compensable damages related to the securities violations alleged herein (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

116.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Imprivata securities and other publicly-traded securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Imprivata or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

117.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

118.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

119.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as

alleged herein;

(b)      whether statements made by Defendants to the investing public during the Class

Period misrepresented material facts about the business, operations and management of Imprivata;

(c)      whether the Individual Defendants caused Imprivata to issue false and misleading

statements during the Class Period;

(d)      whether Defendants acted knowingly in issuing false and misleading statements;

(e)      whether the prices of Imprivata securities were artificially inflated during the

Class Period because of the conduct of Defendants complained of herein; and

(f)      whether the members of the Class have sustained damages and if so, what is the

proper measure of damages.

120.     A class action is superior to all other available methods for the fair and efficient adjudication

of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by

individual Class members may be relatively small, the expense and burden of individual litigation make it

impossible for members of the Class to individually redress the wrongs done to them. There will be no

difficulty in the management of this action as a class action.

121.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-

market doctrine in that:

(a)      Defendants made public misrepresentations or failed to disclose material facts

during the Class Period;

(b)      The omissions and misrepresentations were material;

(c)      Imprivata's securities are traded in an efficient market;

(d)      The Company traded on the NYSE, and was covered by multiple analysts;

(e)      The misrepresentations alleged would tend to induce a reasonable investor to

misjudge the value of the Company's securities; and

(f)     Plaintiff and other members of the Class purchased and/or sold Imprivata

securities between the time Defendants misrepresented or failed to disclose material facts and the

time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

122.    As a result of the foregoing, the market for Imprivata's common stock promptly digested

current information regarding Imprivata from all publicly available sources and reflected such information

in Imprivata's stock price. Under these circumstances, all purchasers of Imprivata's common stock during

the Class Period suffered similar injury through their purchase of Imprivata's common stock at artificially

inflated prices, and a presumption of reliance applies.

123.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a

presumption of reliance upon the integrity of the market.

124.    Alternatively, Plaintiff and members of the Class are entitled to the presumption of reliance

established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 92 S. Ct.

1456, 31 L. Ed. 2d 741 (1972) as Defendants omitted material information in their Class Period statements

in violation of a duty to disclose such information, as detailed above.

## FIRST CLAIM

## Violation of Section 10(b) of The Exchange Act and Rule 10b-5

## Promulgated Thereunder Against All Defendants

125.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth

herein.

126.    During the Class Period, Defendants disseminated or approved the false statements specified

above, which they knew or deliberately disregarded were misleading in that they contained

misrepresentations and failed to disclose material facts necessary in order to make the statements made, in

light of the circumstances under which they were made, not misleading.

127.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed

devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Imprivata securities during the Class Period.

128.   Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Imprivata securities. Plaintiff and the Class would not have purchased Imprivata securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**SECOND CLAIM**

**Violation of Section 20(a) of the Exchange Act**

**Against the Individual Defendants and the Controlling Shareholder Defendants**

129.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

130.   The Individual Defendants acted as controlling persons of Imprivata within the meaning of §20(a) of the Exchange Act. By reason of their positions with the Company, and their ownership of Imprivata securities, the Individual Defendants had the power and authority to cause Imprivata to engage in the wrongful conduct complained of herein. Imprivata controlled the Individual Defendants and all of the Company's employees.

131.   By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

132.   The Controlling Shareholder Defendants acted as controlling persons of Imprivata within the meaning of §20(a) of the Exchange Act.  The Controlling Shareholder Defendants participated in the operation and management of Imprivata, and conducted and participated, directly and indirectly, in the conduct of Imprivata's business affairs.  Because of the Controlling Shareholder Defendants' positions as the Company's largest shareholders, and participation through its appointees on the Audit Committee,

Compensation Committee and Nominating and Corporate Governance Committees, and control over Board members, the Controlling Shareholders were control persons of the Company.

133.    Because of their positions of control and authority the Controlling Shareholder Defendants had the power to direct the actions of, and exercised the same to cause, Imprivata to engage in the unlawful acts and conduct complained of herein.  The Controlling Shareholder Defendants exercised control over the general operations of Imprivata and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

134.    By reason of such conduct, the Controlling Shareholder Defendants are liable pursuant to §20(a) of the Exchange Act.

135.    This action was filed within two years of discovery of the fraud and within five years of each plaintiffs' purchases of securities giving rise to the cause of action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, and certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding rescission or a rescissory measure of damages; and

E.    Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: August 15, 2016

Respectfully submitted,

**BLOCK & LEVITON, LLP**

*/s/ Jeffrey C. Block*
Jeffrey C. Block (BBO # 600747)
Jason M. Leviton (BBO # _____)
Jeff@blockesq.com
Jason@blockesq.com
155 Federal Street, Suite 400
Boston, Massachusetts 02110
(t) (617) 398-5600 (f) (617) 507-6020

*Liaison Counsel for Lead Plaintiff*

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen
Phillip Kim
Sara Fuks (*admitted pro hac vice*)
275 Madison Avenue, 34th Floor
New York, New York
 (t) (212) 686-1060
(f) (212) 202-3827
lrosen@rosenlegal.com
pkim@rosenlegal.com
sfuks@rosenlegal.com

*Lead Counsel for Lead Plaintiff*

## CERTIFICATE OF SERVICE

I, Jeffrey C. Block, hereby certify that a copy of the foregoing document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ *Jeffrey C. Block*
Jeffery C. Block