UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
MARK HENSLEY, Individually and on Behalf    )
of All Others Similarly Situated,[1]        )
                                        )
                    Plaintiff,          )
                                        )
v.                                      )        Case No. 16-cv-10160-LTS
                                        )
IMPRIVATA, INC., et al.,                )
                                        )
                    Defendants.         )
_____)

AMENDED ORDER ON MOTIONS TO DISMISS (DOCS. 39, 40)[2]

May 16, 2017

SOROKIN, D.J.

Plaintiff Mark Hensley, on behalf of himself and a putative class of shareholders, alleges

multiple Defendants deceived investors into buying Imprivata, Inc.'s ("Imprivata"), stock at

artificially high prices from July 30, 2015, through November 2, 2015 (hereinafter, the "class

period"), by materially misrepresenting Imprivata's sales outlook.  See Doc. 33 at 1.  For the

reasons that follow, the Court ALLOWS:  (1) the Motion to Dismiss filed by Defendants

Imprivata, Omar Hussain, Jeffrey Kalowski, David Orfao, David Barrett, and Paul Maeder (Doc.

39); and (2) the Motion to Dismiss filed by Defendants General Catalyst Group II, L.P.

("GCG"), Highland Capital Partners VI Limited Partnership ("Highland Capital"), and Polaris

Venture Partners III, L.P. ("Polaris") (Doc. 40).

_____
[1] When this action was filed on February 2, 2016, the named plaintiff was Leonard Coyer.  Doc. 1 at 1.  However, in the operative Amended Complaint filed on August 15, 2016, the named plaintiff is Mark Hensley.  Doc. 33 at 1. This change is immaterial for purposes of this Order.

[2] This Amended Order is identical to the original Order issued yesterday except that the Court has revised footnote 10 (now footnote 11).

# I.    FACTUAL BACKGROUND[3]

## A.    Overview of Defendants

### 1.    Imprivata

Imprivata is an "IT security company that provides authentication . . . technology solutions for the healthcare and other industries in the United States" and internationally.  Doc. 33 at 6.  It became a public company in June 2014.  Id. at 2.  Its "flagship product" is OneSign, an authentication system that helps companies manage who can access computer servers and files.  Id. at 12.  Imprivata "sells its products and solutions" to healthcare and non-healthcare organizations.  Id.  Sales to large hospitals comprise 75 percent of Imprivata's total sales, while "the small hospital market and the non-healthcare market comprise 25% of [its] total sales."  Id. at 14.  In 2014, 88 percent of Imprivata's "revenue from new sales were attributable to sales to healthcare organizations," Doc. 44-8 at 3, meaning 12 percent of that revenue was attributable to sales to non-healthcare organizations.

For Imprivata's first four quarters as a public company, i.e., from the third quarter of 2014 through the second quarter of 2015,[4] it exceeded its maximum revenue projections.  Doc. 44-3 at 2.  Indeed, in three of those four quarters, the company exceeded its maximum revenue

---

[3] The Court "draw[s] the following statement of facts from" the Amended Complaint (Doc. 33) and from "documents the authenticity of which are not disputed by the parties; official public records; documents central to plaintiffs' claims; or documents sufficiently referred to in the complaint."  Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc., 778 F.3d 228, 232 & n.2 (1st Cir. 2015) (citation, internal quotation marks, and modifications omitted).  In considering the instant motions, the Court "accept[s] as true all well-pleaded allegations in the complaint and make[s] all reasonable inferences in favor of" Plaintiff.  Ganem v. InVivo Therapeutics Holdings Corp., 845 F.3d 447, 454 (1st Cir. 2017) (citation omitted).  However, the Court does not accept any averment – even if "couched as a factual allegation" – that is either "so threadbare" that there is no "meaningful factual content" or "so subjective that it fails to cross the line between the conclusory and the factual."  A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 81 (1st Cir. 2013) (citations and internal quotation marks omitted).

[4] Henceforth, the Court will typically refer to yearly quarters using shorthand.  For example, the third quarter of 2014 will be referred to as "Q3 2014," the second quarter of 2015 as "Q2 2015," and so on.

projections (all of which were under thirty-million dollars) by over one million dollars, and in one of those three quarters it exceeded the maximum by two-million dollars.  Id.

In Q3 2015, however, the only full quarter during the class period, the company underperformed its initial minimum revenue projection:  it initially projected it would earn at least $31 million, but only earned $29,282,000.  Id.

For at least three straight quarters afterward, from Q4 2015 through Q2 2016, Imprivata again exceeded its maximum revenue projections.  Id.  For Q4 2015, the company projected it would earn $32 million to $34 million, but it ultimately earned $34.2 million.  Id.  For Q1 2016, it projected it would earn $28.5 million to $30 million, but it ultimately earned $31,521,000.  Id. And for Q2 2016, the company projected it would earn $32.5 million to $34 million, but it ultimately earned over $36 million.  Id.


### 2.     The Remaining Defendants

Hussain was at all relevant times the CEO of Imprivata.  Doc. 33 at 2.  Kalowski was at all relevant times the CFO of Imprivata.  Id.

After Imprivata went public, GCG, Highland Capital, and Polaris (collectively, "the Controlling Shareholder Defendants") each owned 19.6 percent of Imprivata stock, meaning they collectively owned 58.8 percent.  Id. at 8.

Orfao was employed by GCG; Maeder was employed by Highland Capital; and Barrett was employed by Polaris.  Id. at 7.  At all relevant times, they were members of Imprivata's board of directors and had "power and authority to control the contents of [Imprivata's] public filings with the SEC."  Id.

B.      Relevant Information About the Healthcare Industry

On August 4, 2014, the U.S. Department of Health and Human Services issued a rule

stating that, on October 1, 2015, nearly all hospitals would need to switch from using codes in

the International Classification of Diseases 9 ("ICD-9") to using codes in the ICD-10, for

purposes of medical billing.  See 79 Fed. Reg. 45,128 (to be codified at 45 C.F.R. pt. 162).  This

switch was a "significant change" that was "well known by those in the healthcare community

for some time."  Doc. 33 at 14.  Indeed, well before the August 4, 2014, rule was announced,

"[a]ll segments of the health care industry ha[d] invested significant time and resources in

financing, training, and implementing necessary changes to systems . . . in order to prepare for

ICD-10."  79 Fed. Reg. at 45,129; see also Andrew Pollack, Who Knows the Code for Injury by

Orca?, N.Y. Times, Dec. 30, 2013, at B1 (article about hospitals' preparations to switch to ICD-

10).

The Amended Complaint also alleges that the healthcare industry was undergoing

"consolidation (i.e., smaller hospitals were getting bought by larger hospitals)," Doc. 33 at 4, but

does not state when this consolidation began.


C.      Imprivata's Acquisition of HT Systems

On April 30, 2015, Imprivata acquired the company HT Systems, which makes a "palm-

vein based identification technology" called PatientSecure.  Id. at 2.  PatientSecure "is able to

distinguish vein patterns in patients' hands and thereby retrieve their correct medical records in a

healthcare provider's electronic health record system when a patient checks into a hospital."  Id.

at 13.  "Imprivata represented the acquisition of HT Systems . . . as an opportunity for [it] to

enter the emerging $2 billion patient identification market."  Id.  In 2014, HT Systems' revenue

was $6.1 million and it generated an operating profit.  Doc. 44-10 at 5.  Imprivata paid $19.1 million for the acquisition, which was 16.2% of its assets as of December 31, 2014.  Doc. 33 at 13.

The Amended Complaint relies, in part, on information from various unnamed former employees ("FEs") at Imprivata.  One such employee ("FE5" in the Amended Complaint) was an Imprivata sales manager in Florida from April 2015 through April 2016.  Id. at 10.  In terms of seniority, FE5 was three levels down from CEO Omar Hussain – such that she reported to someone who reported to someone who reported to Hussain.  Id.  However, she still "frequently interacted and met" with Hussain.  Id.  According to FE5, Imprivata acquired HT Systems "not simply for its PatientSecure product but for the pipeline of HT's many sales prospects who were supposedly interested in buying PatientSecure."  Id. at 18.  However, FE5 states, Imprivata eventually discovered that "prospective customers had not even seen the device, much less agreed to purchase it," so "the sales pipeline was false."  Id.  According to the Amended Complaint, FE5 "had frequent conversations with Hussain . . . and confirmed" that, "at least by the beginning of July of 2015," "all of the top executives at Imprivata were fully aware, . . . that in acquiring HT [Systems,] Imprivata had spent a tremendous amount of cash in reliance on a sales opportunity that did not exist and for a product that customers were not interested in buying."  Id. at 18-19; see also id. at 18 ("FE5 stated that Defendant Hussain in particular was keenly aware that the acquisition of HT Systems and PatientSecure was a disaster by at least by the beginning of July of 2015.").  According to FE5, "as of July 2015, Imprivata had not booked any significant sales of PatientSecure."  Id. at 19.

D.    Other Allegations by FEs

According to another FE ("FE1"), who worked as a Senior Product Marketing Manager from November 2014 to April 2015, id. at 9, "[b]y April 2015, only 25-30 units" of one of Imprivata's products, ConfirmID, had been sold.  Id.

FE2 worked as a sales representative from March 2013 to December 2015, and "was focused on sales to small hospitals and health facilities."  Id. at 9.  According to FE2, "numerous potential Imprivata customers informed sales representatives that as much as they might like to invest in Imprivata's security products[,] they would simply have no money to buy them because their budgets were consumed by the need to deal with the government's mandate that [nearly] all . . . healthcare providers convert their computer systems to use ICD-10 coding."  Id. at 16.  FE2 states that "when Defendants issued their Q3 2015 sales forecast in July of 2015, there was absolutely no sales backlog."  Id.

FE3 was the Director of Government and Commercial Sales for Imprivata between November 2013 and January 2016, and reported to the Senior Vice President of World Wide Sales, who reported to Hussain.  Id. at 9.  FE3 alleges Hussain and CFO Jeffrey Kalowski were "hands-on managers who regularly attended sales meetings and monitored sales by viewing the Company's" sales database.  Id. at 15.  FE3 also states that it was "well-documented in" the database that "non-healthcare sales were a complete failure throughout all of 2015."  Id. at 17.

FE4 worked as a regional sales manager from January 2015 through January 2016.  Id. at 9-10.  According to FE4, "it was readily apparent" from Imprivata's sales tracking software "that sales in the Company overall were declining during 2015."  Id. at 15.  FE4 reports that "Imprivata sales staff rarely achieved their sales quotas."  Id. at 16.  FE4 further states that "by

the spring of 2015 half of the sales force in the non-healthcare segment had left the Company,

frustrated with its lack of success and sales." Id. at 17.


E.    Imprivata's 2014 10-K

On March 11, 2015, Imprivata filed its 10-K for the fiscal year ending December 31, 2014.

See Doc. 44-8.  The 10-K stated:

-   "We have a history of losses, we expect to continue to incur losses and we may not be
    profitable in the future. . . .  [O]ur profitability will be affected by, among other things,
    our ability to develop and commercialize new solutions, and products for those solutions,
    and enhance existing solutions and products." Id. at 4.

-   "We depend on sales of our Imprivata OneSign solution in the healthcare industry for a
    substantial portion of our revenue, and any decrease in its sales would have a material
    adverse effect on our business, financial condition and results of operation." Id.

-   "Healthcare organizations are currently facing significant budget constraints . . . .
    Although [they] are currently allocating funds for capital and infrastructure
    improvements to benefit from governmental initiatives, they may not choose to prioritize
    or implement access or authentication management solutions as part of those efforts at
    this time, or at all, due to financial and resource constraints." Id.

-   "In addition, our healthcare customers have been experiencing consolidation in response
    to developments generally affecting the healthcare industry.  As a result, we may lose
    existing or potential healthcare customers for our solutions.  If our existing customers
    combine with other healthcare organizations that are not our customers, they may reduce
    or discontinue their purchases of our solutions." Id. at 5.

-   "We do not anticipate that sales of our solutions in non-healthcare industries will
    represent a significant portion of our revenue for the foreseeable future." Id.; see also id.
    at 12 ("[W]hile add-on sales to non-healthcare customers have continued to increase, new
    sales to non-healthcare customers have been decreasing.").

-   "Developments generally affecting the healthcare industry, including new regulations[, as
    well as] changes in pricing for healthcare services or impediments to third-party
    reimbursement for healthcare costs, may cause deterioration in the financial or business
    condition of our customers and cause them to reduce their spending on information
    technology." Id. at 6.

- "Our revenue and operating results have fluctuated, and are likely to continue to fluctuate, which may make our quarterly results difficult to predict, cause us to miss analyst expectations and cause the price of our common stock to decline." Id. at 7.

- "Industry consolidation or new market entrants may result in increased competitive pressure, which could result in the loss of customers or a reduction in revenue." Id. at 9.

- "If we do not achieve the anticipated strategic or financial benefits from our acquisitions, or if we cannot successfully integrate them, our business and operating results could be adversely affected.  We have acquired, and in the future may acquire, complementary businesses, technologies or assets that we believe to be strategic.  We may not achieve the anticipated strategic or financial benefits, or be successful in integrating any acquired businesses, technologies or assets." Id. at 10.

F.      Alleged Misrepresentations

1.      First Alleged Misrepresentation

On July 29, 2015, after the close of trading, Imprivata issued a press release announcing

its earnings for Q2 2015.[5]  Doc. 44-12.  The release also contained "forward-looking statements

. . . , including but not limited to . . . [Imprivata's] expected financial results for Q3 2015 and the

full fiscal year 2015." Id. at 10.  The release stated:

These forward-looking statements are made as of the date they were first issued and were based on current expectations, estimates, forecasts, and projections as well as the beliefs and assumptions of management. Forward-looking statements are subject to a number of risks and uncertainties, many of which involve factors or circumstances that are beyond Imprivata's control.  Imprivata's actual results could differ materially from those stated or implied in forward-looking statements due to a number of factors, including but not limited to . . . developments in the healthcare industry or regulatory environment; seasonal variations in the purchasing patterns of our customers; the lengthy and unpredictable sales cycles for new customers; . . . our ability to successfully integrate HT Systems and other businesses and assets that we may acquire . . . , and the other risks detailed in Imprivata's risk factors discussed in filings with the U.S. Securities and Exchange Commission ("SEC"), including but not limited to Annual Report on Form 10-K for the year ended December 31,

---

[5] The press release statements mentioned in this paragraph are not alleged to be misrepresentations but are relevant for purposes of this Order.

> 2014 filed with the SEC on March 11, 2015, as well as other documents
> that may be filed by Imprivata from time to time with the SEC.

Doc. 44-12 at 10.

The press release also stated: "For the full-year, we expect revenue between $124.0 million and $126.0 million and Adjusted EBITDA [i.e., earnings before interest, tax, depreciation and amortization] to be between a loss of $10.0 million and $8.5 million. . . . For [Q3 2015], we expect revenue between $31.0 million and $31.5 million and Adjusted EBITDA to be between a loss of $4.2 million and $3.9 million." Doc. 33 at 20. The Amended Complaint asserts "Defendants knew that Imprivata would not achieve" these revenue forecasts because they "knew" that demand for the company's IT solutions had "dramatically declined" and would continue to fall (1) among healthcare customers, who "were delaying their acquisitions of IT solutions due to the transition to ICD-10 coding"; (2) among "non-healthcare clients[,] . . . because of competition from other security providers, who, unlike Imprivata, devoted marketing resources to customers in the non-healthcare segment[,] and because half of Imprivata's non-healthcare sales staff had left the Company"; and (3) among small hospitals, due to "industry consolidation as well as the transition to ICD-10 coding." Id. at 21.

### 2. Second Alleged Misrepresentation

In the same July 29, 2015, press release, Imprivata stated: "We have . . . completed a key acquisition [i.e., of HT Systems]. We have driven growth both through the acquisition of new customers[] and strong add on business to our existing customers. I[6] am especially excited about the launch of our PatientSecure product. . . . PatientSecure will solidify our leadership as a

---

[6] It is not clear to whom "I" refers, but the Court assumes it refers to either Hussain or Kalowski. The identity of the writer is irrelevant for purposes of this Order.

security platform for healthcare." Doc. 44-12 at 6. The Amended Complaint asserts these statements were "false and misleading because Defendants knew that the HT Systems sales pipeline was grossly exaggerated and that the PatientSecure product was not something that HT's purported prospective customers were in fact going to purchase." Doc. 33 at 21.

### 3. Third Alleged Misrepresentation

On the same date that Imprivata issued the press release, July 29, 2015, the company held a conference call with analysts and investors. Id. During the call, Kalowski stated: "We are seeing increased demand for our subscription products and I want to point out that as we cross-sell our subscription-based products, we expect this trend to continue. . . . We anticipate recognizing revenue of approximately $26.8 million from the backlog over the course of 2015, $17.5 million of which is maintenance revenue." Doc. 44-13 at 4. With regard to Imprivata's "2015 financial outlook," Kalowski stated: "We are narrowing our revenue range for full-year 2015 by raising the low end of the range from $123.5 million to $124 million. Our new range is $124 million to $126 million. Historically, we have seen significantly higher revenues in the fourth quarter [of the year], and as a result we are forecasting an EBITDA profit in [that quarter]." Id. at 5. The Amended Complaint asserts these statements were materially misleading because Kalowski knew demand for Imprivata's IT solutions had declined and would continue to fall due to the transition to ICD-10 coding and consolidation in the hospital industry. Doc. 33 at 22; see also id. at 24 (complaining that, during the conference call, "Defendants admitted but failed to disclose[7] the risks related to its revenue forecast that ICD-10 would cause a decreased demand for its products and slowdown in growth").

---

[7].

### 4. Fourth Alleged Misrepresentation

During the same conference call, Hussain stated that the "[a]cquisition of HT Systems is a major step in expanding [Imprivata's] identification and authentication platform from providers to patients." Id. at 23. Hussain also stated, "Since our announcement of the acquisition[,] we have seen tremendous interest in Imprivata PatientSecure from our existing customers." Id. An analyst asked, "So on the HT Systems[,] can you just give us any kind of early read on the integration efforts there?" Id. Hussain responded that "the integration is going on plan, on target." Id. The Amended Complaint asserts these statements were materially misleading "because Defendants knew that the integration was not 'on target' but was instead a complete nightmare where HT Systems' entire sales pipeline proved to be 'bogus' and that there was no interest in purchasing PatientSecure either by existing customers or by supposed customers obtained through the HT Systems acquisition." Id.

### 5. Fifth Alleged Misrepresentation

On July 31, 2015, Imprivata filed its quarterly report to the SEC ("10-Q") for Q2 2015 (which ended June 30, 2015).[8] Doc. 44 at 3; Doc. 44-14. The 10-Q stated: "Industry consolidation or new market entrants may result in increased competitive pressure, which could result in the loss of customers or a reduction in revenue." Doc. 44-14 at 12. It also stated: "The market for biometric technology is still developing. There can be no assurance that Imprivata PatientSecure solution will be successful." Id. at 14.

The 10-Q stated: "Developments in the healthcare industry or regulatory environment could adversely affect our business." Doc. 33 at 23. It also stated: "Developments generally

---

[8] The 10-Q statements mentioned in this paragraph are not alleged to be misrepresentations but are relevant for purposes of this Order.

affecting the healthcare industry, including new regulations or new interpretations of existing

regulations, such as reductions in funding, changes in pricing for healthcare services or

impediments to third-party reimbursement for healthcare costs, may cause deterioration in the

financial or business condition of our customers and cause them to reduce their spending on

information technology.  As a result, these developments could adversely affect our business."

Id.  The Amended Complaint asserts these risk disclosures were materially misleading and "not

sufficiently specific or meaningful, because Defendants knew but failed to disclose that the

imminent transition by Imprivata's healthcare customers to ICD-10 would take place on October

1, 2015[,] and severely diminish demand for its products."  Id.


    G.    Alleged Insider Trading

    On August 3, 2015, Imprivata announced a secondary public offering of 4.35 million

shares of common stock by its controlling shareholders and its officers.  Id. at 3.  On the same

date, the company filed a Prospectus Supplement with the SEC stating that investing in

Imprivata's "common stock involves a high degree of risk," in part because (1) the company

"may not be able to attract new customers and retain and increase sales to our existing

customers," and (2) "developments in the healthcare industry or regulatory environment could

negatively affect our business."  Doc. 44-15 at 2-3.

    On August 5, 2015, GCG, Highland Capital, and Polaris sold about $68.5 million worth

of stock.  Id. at 3.  Plaintiff asserts these were "insider sales," noting the "amount and timing,"

particularly "in light of the fact that none of [the Controlling Shareholder Defendants] had sold

any shares since the Company's IPO [in June 2014]."  Id. at 31.

Between August 3, 2015, and October 13, 2015, Hussain sold 70,000 shares of common stock for approximately $1.3 million, and Kalowski sold 33,639 shares for approximately $600,000. Id. Plaintiff calls these stock sales, as well as stock sales by certain non-defendant Imprivata executives during the class period, "insider sales." Id. at 31-32. The Amended Complaint does not state what these individual defendants' trading patterns were before the class period began. See id. The sales by these Defendants were made pursuant to Rule 10b5-1 trading plans dated November 25, 2014, more than eight months before the class period began on July 30, 2015. Doc. 44-2. Defendants assert, and Plaintiff does not contest, that, at the end of the class period, all of the Imprivata executives alleged to have made insider sales, including Hussain and Kalowski, retained anywhere from 86 to 93 percent of the stock and options that they owned before the class period began. Id. at 2.

H.      Disclosure of Imprivata's Q3 2015 Earnings

On October 14, 2015, the price of Imprivata common stock was $17.31 at the close of trading. Doc. 33 at 27. After the close, Imprivata issued a press release with preliminary Q3 2015 financial results, stating that its revenues for that quarter would be between $28.9 to $29.2 million, Doc. 44-17 at 6, rather than "in the range of $31 [to] $31.5 million that the Company had stated it was on track to achieve in the quarter on July 29, 2015." Doc. 33 at 26. Hussain said, "We are disappointed with our performance in the third quarter," and blamed the shortfall on three factors: (1) the delay of "a few large deals . . . due to customer implementation schedules"; (2) a "faster than expected" deceleration in non-healthcare sales; and (3) fewer than expected "sales to smaller hospitals." Id. Hussain further stated: "Some of these potential

customers are pushing out their purchases as they grapple with going live with ICD-10 and potential effects of mergers and acquisitions in this segment of the hospital market." Id.

On October 15, 2015, Imprivata stock closed at $12 and the stock was traded at "more than 32 times the average daily volume over the preceding ten days." Id. at 27.

On November 2, 2015, Imprivata stock closed at $10.39 per share. Id. at 29. After the close, Imprivata disclosed its final Q3 2015 financial results, which showed $29.3 million of revenue, slightly higher than the revised maximum projection in the October 14, 2015, press release. Doc. 44-18 at 6. In a conference call with investors that day, Hussain stated that Imprivata had seen a "slowdown in small hospital purchases which [Imprivata] believe[s] resulted from industry consolidation concerns and ICD-10." Doc. 33 at 28. Hussain also stated that sales in the non-healthcare business were below expectations in the third quarter and the company "now expect[ed] that this segment [would] shrink more quickly as a percentage of" revenue. Id. Hussain also stated: "We have concerns about growth in the small hospital market. We don't know whether it was a surprise to us on how much behind plan they were. But significantly behind plan they were this quarter and the non-healthcare, we don't know how fast it will shrink. . . . [C]learly, a component of our growth for next year is going to be affected because[] these two components comprise roughly 25% of our overall revenue number." Id.; see also Doc. 44-19 at 6-7.

On November 3, 2015, Imprivata stock closed at $9.42 per share. Doc. 33 at 29.

II.    LEGAL BACKGROUND

Plaintiff claims all Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, by making materially misleading statements to defraud

investors during the class period. Doc. 33 at 35-36. Plaintiff also claims all Defendants except Imprivata violated § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), because they "direct[ed] the actions of . . . Imprivata to engage in" the violations of § 10(b) and Rule 10b-5.[9] Doc. 33 at 37.

"To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead the following elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." Ganem, 845 F.3d at 454 (citations omitted). Both Motions to Dismiss argue Plaintiff has inadequately pleaded the first two elements.[10] Docs. 41, 42.

A.      Material Misrepresentation or Omission

"To establish a material misrepresentation or omission, [the plaintiff] must show that defendants made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading." Ganem, 845 F.3d at 454 (citation and internal quotation marks omitted). "Mere possession of material, nonpublic information does not create a duty to disclose it, but when a company speaks, it cannot omit any facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." Id. (citations, internal quotation marks, and modifications omitted). Under the Private Securities Litigation Reform Act of 1995 (PSLRA), which Congress enacted "to combat perceived abuses in securities litigation with heightened pleading requirements," a "plaintiff must specify each statement alleged to have been misleading and the reason or reasons why the

_____

[9] Because the Court "dismisse[s] the § 10(b) claim, the derivative control person claim under § 20(a)" is also dismissed and "needs no separate discussion." Ganem, 845 F.3d at 454 (citation omitted); In re Boston Sci. Corp. Sec. Litig., 686 F.3d 21, 26 n.1 (1st Cir. 2012) (citation omitted).

[10] The Court agrees with this argument and thus need not address the Motions' other arguments for dismissal.

statement is misleading." Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2413 (2014); Ganem, 845 F.3d at 455 (citing, *inter alia*, 15 U.S.C. § 78u-4(b)(1)) (internal quotation marks omitted).

A "fact is material where there is a substantial likelihood that its disclosure would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." In re Ariad Pharms., Inc. Sec. Litig., 842 F.3d 744, 750 (1st Cir. 2016) (citation and internal quotation marks omitted). "A statement can be false or incomplete but not actionable if the misrepresented fact is otherwise insignificant." Fire & Police Pension, 778 F.3d at 240 (citations and internal quotation marks omitted). Indeed, even before the enactment of the PSLRA, courts "demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace." Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1217-18 (1st Cir. 1996) (citing, as examples of such affirmations, a company's statement that it "expected another year of strong growth in earnings per share," that it was "on target toward achieving the most profitable year in its history," that it was "well-positioned for growth," and that its "[p]rospects for long term growth are bright"). Thus, in Shaw, the First Circuit found immaterial a CFO's statements that (1) his company's transition to selling certain products was "going reasonably well"; (2) the company "should show progress quarter over quarter, year over year"; and (3) the company was "basically on track" and "a very healthy company." 82 F.3d at 1219. The Court explained that "[t]hese statements all so obviously fail to pose any substantial likelihood of being viewed by the reasonable investor . . . as having significantly altered the total mix of information available that they are properly deemed immaterial as a matter of law." Id. (citation, footnote, and internal quotation marks omitted).

The PSLRA's "safe harbor" provision, 15 U.S.C. § 78u-5, "sharply limits liability of companies and their management for certain 'forward-looking statements,' . . . when such statements are accompanied by appropriate cautionary language." In re Smith & Wesson Holding Corp. Sec. Litig., 669 F.3d 68, 71 n.3 (1st Cir. 2012). "Under this provision, a person shall not be liable with respect to any forward-looking statements when not made with knowledge of falsity or when the statement itself is identified as forward-looking and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." Ganem, 845 F.3d at 452 n.3 (citations and internal quotation marks omitted). Relatedly, "[a] plaintiff may not plead 'fraud by hindsight'; i.e., a complaint may not simply contrast a defendant's past optimism with less favorable actual results in support of a claim of securities fraud." Id. at 457 (citations and internal quotation marks omitted). The securities laws "do not make it unlawful for a company to publicize an aggressive timeline or estimate for a proposed action without disclosing every conceivable stumbling block to realizing those plans." Id.

However, the First Circuit has also declined to adopt the view that "*any* representations" as to a corporate institution's "plans, goals, and beliefs about the future are not actionable as forward-looking optimistic opinions." ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 61-62 n.11 (1st Cir. 2008) (emphasis added; citation omitted). The Court has stated that "a statement of opinion may be considered factual in at least two respects: as a statement that the speaker actually holds the opinion expressed and as a statement about the subject matter underlying the opinion." Id. (citations and internal quotation marks omitted). Thus, "[d]epending on circumstances, some statements of opinions or estimates may qualify as false or misleading statements of fact." Id. (citation omitted); see also Glassman v. Computervision Corp., 90 F.3d

617, 635 (1st Cir. 1996) ("A duty to disclose technical or developmental problems with a product may arise where a company makes strongly optimistic or concrete statements about that product that are in stark contrast to its internal reports.") (citation omitted).

B.    Scienter

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud," or "a high degree of recklessness." In re Ariad, 842 F.3d at 750 (citations and internal quotation marks omitted). "[I]n this context, recklessness requires an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers that is either known to the defendant or is so obvious the actor must have been aware of it." Id. (citation, internal quotation marks, and modifications omitted). The First Circuit has resisted "attempts to dilute this stringent standard" for recklessness, and described it as "closer to a lesser form of intent than it is to ordinary negligence." Local No. 8 IBEW Ret. Plan & Trust v. Vertex Pharms., Inc., 838 F.3d 76, 80 & n.6 (1st Cir. 2016) (citations and internal quotation marks omitted). "[A]llegations of merely unreasonable conduct do not sufficiently plead scienter." Id. at 80 n.6. Similarly, "negligence or puffing are not enough for scienter." Auto. Industries Pension Trust v. Textron, 682 F.3d 34, 39 (1st Cir. 2012) (citation omitted). Moreover, attempts "to provide investors with warnings of risks generally weaken the inference of scienter." City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp., 632 F.3d 751, 760 (1st Cir. 2011) (citations and internal quotation marks omitted).

"At the pleading stage, the PSLRA requires [a plaintiff] to state with particularity the facts giving rise to a strong inference that the defendant acted with scienter." In re Ariad, 842 F.3d at 751 (citation and italics omitted). "To qualify as 'strong' an inference of scienter must be

more than merely plausible or reasonable, it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id. (citation, internal quotation marks, and modifications omitted). The First Circuit has "found this exacting standard satisfied where the complaint contains clear allegations of admissions, internal records or witnessed discussions suggesting that at the time they made the statements claimed to be misleading, the defendant officers were aware that they were withholding vital information or at least were warned by others that this was so." Id. at 751 (citation and internal quotation marks omitted); see also Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 97 (1st Cir. 2007) ("[T]he requisite scienter is an intent to deceive at the time the [statement] was made . . . .") (citing Wharf (Holdings) Ltd. V. United Intern. Holdings, Inc., 532 U.S. 588, 596-97 (2001)). "In imposing this heightened pleading standard" through the PSLRA, "Congress recognized and accepted the inherent risk of leaving without remedy some wrongs that discovery or trial might have disclosed." In re Ariad, 842 F.3d at 751 (citation, internal quotation marks, and modifications omitted); see also In re Boston Sci., 686 F.3d at 30 (stating that "securities class actions pose a special risk of vexatious litigation," which the PSLRA seeks to decrease) (citation and internal quotation marks omitted).

The Court must "examine each alleged fact in turn, and then conclude by assessing them cumulatively." Local No. 8, 838 F.3d at 81. Each "individual fact about scienter may provide only a brushstroke, but it is [the Court's] obligation to consider [whether] the resulting portrait" creates a "strong inference of scienter." Id. at 81, 86 (citation and internal quotation marks omitted); see also Fire & Police Pension, 778 F.3d at 241 ("Scienter should be evaluated with reference to the complaint as a whole rather than to piecemeal allegations.") (citation, internal quotation marks, and modifications omitted).

"[T]he materiality and scienter inquiries are linked." In re Ariad, 842 F.3d at 750

(citation and internal quotation marks omitted). "This is because the marginal materiality of an

omitted fact tends to undercut the argument that defendants acted with the requisite intent in not

disclosing it." Id. (citation, internal quotation marks, and modifications omitted). Conversely,

"the importance of a particular item to a defendant can support an inference that the defendant is

paying close attention to that item." Local No. 8, 838 F.3d at 82 (citation and internal quotation

marks omitted). "Such an inference, however, is only helpful in establishing scienter if that close

attention would have revealed an incongruity so glaring as to make the need for further inquiry

obvious." Id. (providing the example that a steep decline in operating margins creates the

inference that a "Chief Financial Officer, who was paying close attention to these numbers,

would investigate the cause") (citations and internal quotation marks omitted). "Similarly, some

cases have recognized that certain key facts known to lower-level company managers concerning

a company's flagship product, such as whether a $100 million contract has been signed to sell

the product, or that sales are falling fast rather than rising, are very likely known to senior

management who made repeated public announcements concerning sales of the product." Id. at

83 (citation omitted).

Another factor that may be probative of scienter is insider trading. Id. at 84. However,

for "stock sales by corporate officials to bolster an inference of scienter, the trading must be, at a

minimum, unusual, well beyond the normal patterns of trading by those defendants." Fire &

Police Pension, 778 F.3d at 246 (stating that the sales must be "out of the ordinary or

suspicious") (citations and internal quotation marks omitted). For example, in Local No. 8, the

First Circuit found a complaint's allegation of insider trading insufficient to show scienter where

the two most senior corporate officer defendants "made no sales out of the ordinary course," and

where there was "no allegation as to what proportion of his or her total stock any other defendant sold during the class period." 838 F.3d at 85 n.11.

III.  DISCUSSION

A.  First Alleged Misrepresentation

Plaintiff claims its section 10(b) claim is supported by Imprivata's statement in its July 29, 2015, press release that, in Q3 2015, it "expect[ed] revenue between $31.0 million and $31.5 million." Doc. 33 at 20. Plaintiff states Defendants "knew" Imprivata would not achieve these revenue forecasts because they "knew" that demand for the company's products were falling for various reasons, including the transition by hospitals to ICD-10 coding, competition from non-healthcare security providers for non-healthcare clients, and consolidation in the hospital industry. Id. at 21. The Court finds Imprivata's revenue projection for Q3 2015 is not actionable, for two independently sufficient reasons: (1) it was identified as a forward-looking statement and accompanied by meaningful cautionary statements; and (2) the Amended Complaint's allegations of scienter are inadequate.

1.  Status as a Forward-Looking Statement

Although Imprivata's Q3 2015 revenue turned out to be inaccurately optimistic, it is not actionable under the PSLRA's "safe harbor" provision because it was identified as a forward-looking statement and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." Ganem, 845 F.3d at 452 n.3. Plaintiff argues the safe harbor provision does not apply because the cautionary statements accompanying the revenue projection were not "tailored

to the circumstances," and thus were not sufficiently "meaningful."  Doc. 52 at 23; see also id. at

8 (suggesting Imprivata's cautionary statements were "generic" and "boilerplate").  The Court

disagrees.  In the press release and in Imprivata's 2014 10-K, which was incorporated in the

press release, Imprivata identified various specific factors that could cause actual results to differ

from those in the forward-looking statement, including but not limited to:  (1) consolidation in

the healthcare industry, Doc. 44-8 at 5, 9; (2) decreasing "sales to non-healthcare customers," id.

at 12; (3) "new regulations" and changes in pricing for healthcare services, id. at 6; and (4)

potential failure in integrating acquisitions, with HT Systems mentioned by name, id. at 10; see

also Doc. 44-12 at 10.  These risk factors were tailored to Imprivata's circumstances, not generic

or boilerplate.

To the extent Plaintiff suggests that, for its risk disclosures to be "meaningful," Imprivata

needed to specifically mention the transition to ICD-10 coding, "such detailed disclosure is

unnecessary" and the "cautionary statement does not necessarily have to include the particular

factor that ultimately causes the forward-looking statement not to come true."  Isham v. Perini

Corp., 665 F. Supp. 2d 28, 39 (D. Mass. 2009) (citations and internal quotation marks omitted);

see also Ganem, 845 F.3d at 457 (stating that a company need not disclose "every conceivable

stumbling block" to achieving a goal); In re Genzyme Corp. Sec. Litig., 754 F.3d 31, 34 (1st Cir.

2014) ("[A]s a general matter, a corporation cannot be expected to inform the market of any and

all developments that might possibly affect stock value.") (citation omitted).  Furthermore, the

transition to ICD-10 was, by Plaintiff's own admission, well-known within the healthcare

community, Doc. 33 at 14, and even reported about in *The New York Times* in December 2013.

See supra Section I.B; In re Cabletron Sys., Inc., 311 F.3d 11, 36 (1st Cir. 2002) (stating that a

company was "under no obligation to disclose information on industry-wide trends that was available to the public").

2.     Inadequate Allegations of Scienter

Even assuming the Q3 2015 revenue projection is not subject to the PSLRA's safe-harbor provision, the Amended Complaint fails to create a "strong inference" that any Defendant acted with even the minimum degree of scienter necessary to state a section 10(b) claim, i.e., a "high degree of recklessness." In re Ariad, 842 F.3d at 750. There are several factors that, considered both "in turn" and "cumulatively," Local No. 8, 838 F.3d at 81, support a finding that Plaintiff has inadequately pleaded scienter: (1) Imprivata's cautionary statements throughout the class period; (2) the vagueness of the FEs' allegations; (3) the inadequate allegations of insider trading; and (4) Imprivata's early announcement of its Q3 2015 earnings.

a.     Imprivata's Cautionary Statements

Attempts "to provide investors with warnings of risk generally weaken the inference of scienter." City of Dearborn Heights, 632 F.3d at 760. As already stated, Imprivata offered numerous cautionary statements in its 10-K filed on March 11, 2015, and in the July 29, 2015, press release. See supra Section III.A.1. Indeed, even after it issued the revenue projection, Imprivata continued to provide reasonably specific warnings about risks to its stock value. In its 10-Q, filed on July 31, 2015, Imprivata warned that there may be "increased competitive pressure" due to "[i]ndustry consolidation or new market entrants," and that there could "be no assurance that Imprivata PatientSecure solution will be successful." Doc. 44-12 at 12, 14. Moreover, in the Prospectus Supplement issued on August 3, 2015, Imprivata explained why

investing in its "common stock involves a high degree of risk." Doc. 44-15 at 2-3. These risk disclosures undermine any claim that Defendants engaged in "an extreme departure from the standards of ordinary care." In re Ariad, 842 F.3d at 750.

          b.      Allegations by the FEs

There "must be a hard look at [confidential source] allegations to evaluate their worth." New Jersey Carpenters Pension & Annuity Funds v. Biogen IDEC Inc., 537 F.3d 35, 51 (1st Cir. 2008). The allegations by the FEs do not support a strong inference that the Q3 2015 revenue projection was a misrepresentation made "with a high degree of recklessness." In re Ariad, 842 F.3d at 750.

The Court begins by noting that some of the FEs' allegations are unduly "threadbare" and/or "subjective." See supra n.3. For example, the Amended Complaint states: "FE5 stated that Defendant Hussain . . . was keenly aware that the acquisition of HT Systems and PatientSecure was a disaster by at least the beginning of July of 2015." Doc. 33 at 18. It is not at all clear from this allegation whether Hussain (1) was "keenly aware" of facts that lead *either Plaintiff or FE5* to consider the acquisition of HT Systems a "disaster," or (2) himself considered the acquisition of HT Systems a "disaster." As another example, the Amended Complaint states that, according to FE5, "as of July 2015, Imprivata had not booked any significant sales of PatientSecure." Id. at 19. The Court is left to guess what type or amount of sales FE5 considered "significant."

Nevertheless, even if Imprivata executives considered the acquisition of HT Systems and PatientSecure "a disaster" at the beginning of July 2015, that information, considered both on its own and with the other alleged facts, does not raise a strong inference that Imprivata's revenue

projection for Q3 2015 was an actionable misrepresentation. The Court simply has no basis to infer, much less to strongly infer, that the projection failed to take into account Imprivata executives' allegedly negative feelings about the HT Systems acquisition. See Coyne v. Metabolix, Inc., 943 F. Supp. 2d 259, 267 (D. Mass. 2013) (finding allegations of "struggling sales" did not render a company's projections actionable because the allegations failed to demonstrate that the company was "*incapable* of meeting" its projections) (emphasis in original).

The other FEs do not provide compelling allegations supporting scienter, either. The Court first notes that none of the FEs was involved in the creation of Imprivata's revenue projections. Cf. Fire & Police Pension, 778 F.3d at 245 (discounting confidential witnesses' allegations as evidence of scienter largely because the witnesses were not in senior management positions and had "relatively little ongoing contact with senior management") (citation and internal quotation marks omitted). In fact, one of the FEs, FE1, stopped working for Imprivata in April 2015, Doc. 33 at 9, at least three months before the class period began, "and so would not have had firsthand knowledge of the state of mind of [Imprivata's] management during that period." Fire & Police Pension, 778 F.3d at 245. FE1's allegation that by April 2015 – i.e., by the start of Q2 2015 – Imprivata had only sold 25 to 30 units of ConfirmID is practically meaningless. Doc. 33 at 17. The allegation concerns a time well outside the class period, and is not even about Imprivata's flagship product. Id. at 12. Moreover, there is no indication that sales of 25 to 30 units of ConfirmID by April of the fiscal year was unusually low, much less low enough to support a strong inference that the Q3 2015 revenue projection of $31.0 million was an actionable misrepresentation. Thus, FE1's allegations are of minimal value.

FE2's allegations are likewise minimally helpful to Plaintiff. FE2, whose work "focused on sales to small hospitals and health facilities," alleges that "there was absolutely no sales

backlog" when Defendants issued the Q3 2015 revenue projection in July 2015, and that "numerous potential Imprivata customers" said they could not "invest" in Imprivata products because their budgets "were consumed by the need to deal with" the switch from ICD-9 to ICD-10.  Doc. 33 at 9, 16.  FE2 only has first-hand knowledge of sales to small hospitals, which, in 2014, comprised about 13 percent of Imprivata's revenue from new sales.  See Doc. 33 at 14; Doc. 44-8 at 3.  Furthermore, the allegation that "there was absolutely no sales backlog" fails to support a scienter inference regarding revenue projections especially when no factual allegations suggest FE2 had a role in the projections and the vantage point of the statements (the whole company) was far broader than FE2's narrower perspective.

FE3's allegation that "non-healthcare sales were a complete failure throughout all of 2015," Doc. 33 at 17, does not support a strong inference that the revenue projection was an actionable misrepresentation, either.  Non-healthcare sales produced a mere 12 percent of Imprivata's revenue from new sales in 2014, and the company warned investors in its 2014 10-K that "new sales to non-healthcare customers have been decreasing," and that it did "not anticipate" that sales to non-healthcare customers would "represent a significant portion of [its] revenue for the foreseeable future."  Doc. 44-8 at 5, 12.  More important, as with the other FE allegations, there is no reason to strongly infer that Imprivata's $31.0 million revenue projection did not take into account the weakness of non-healthcare sales.

Finally, FE4's allegations – e.g., that "sales staff rarely achieved their sales quotas" and that "it was readily apparent" sales "in the Company overall were declining during 2015" – do not create, either on their own or in tandem with the other alleged facts, a strong inference that the Q3 2015 revenue projection was an actionable misrepresentation.

c.      The Allegations of Insider Trading Are Unpersuasive

Plaintiff alleges various Imprivata executives and the Controlling Shareholder Defendants engaged in insider trading.  See Doc. 33 at 3, 30-32.  These allegations do not create a strong inference of scienter.  Plaintiff's allegations about the executives "fail even without considering [the 10b5-1] plans" that the executives used, which were formulated in November 2014, and even without considering that the executives all retained at least 86 percent of their holdings from the beginning of the class period until the end.  Fire & Police Pension, 778 F.3d at 246 n.14; see Doc. 44-2.  Plaintiff fails to allege any facts showing that the executives' trading during the class period was unusual, let alone suspicious.  Fire & Police Pension, 778 F.3d at 246.

As for the Controlling Shareholder Defendants, Plaintiff argues that their "sales of a whopping $68,499,990" worth of Imprivata stock – "comprising 34% and 40% of their total holdings" – a "mere five days after the issuance of" the allegedly misleading July 29, 2015, press release is "powerful evidence of motive" and "contributes to an inference of scienter."  Doc. 51 at 14 (italics omitted).  Assuming for the sake of argument that these stock sales were suspicious, "[i]nsider trading cannot establish scienter on its own," only "in combination with other evidence."  Miss. Public Employees' Retirement Sys. v. Boston Sci. Corp., 523 F.3d 75, 92 (1st Cir. 2008) (citations omitted).  Here, the alleged insider trading by the Controlling Shareholder Defendants does not support a strong inference of scienter, particularly given (1) the risk disclosures Imprivata issued – indeed, that it issued in its August 3, 2015, Prospectus Supplement, two days before the alleged insider sales by the Controlling Shareholder Defendants; (2) the absence of any evidence of insider sales by Imprivata's executives; and (3) the dearth of other compelling evidence of scienter.  Cf. Acito v. IMCERA Group, Inc., 47 F.3d

47, 54 (2d Cir. 1995) (rejecting allegation of insider trading by one defendant as sufficient evidence of scienter where other defendants "did not sell their shares during the relevant class period").

### d. Imprivata's Early Announcement of Earnings

Any claim of scienter is further undermined by the fact that Imprivata, on October 14, 2015, issued a press release with preliminary Q3 2015 results and revised its expected quarterly revenue down to between $28.9 and $29.2 million. Doc. 44-17 at 6. This disclosure of "financial problems prior to the deadline to file" financial statements is plainly inconsistent with a high degree of recklessness on Defendants' part. Rombach v. Chang, 355 F.3d 164, 176-77 (2d Cir. 2004); see also In re Nokia Oyj (Nokia Corp.) Sec. Litig., 423 F. Supp. 2d 364, 408 (S.D.N.Y. 2006) (noting the absence of any "obligation to release interim sales data prior to a quarter's end") (citation and internal quotation marks omitted). The Court also notes that, as in the four quarters before Q3 2015 and in the three quarters after it, Imprivata's actual Q3 2015 revenue exceeded its maximum projection (as revised). Doc. 44-18 at 6.

For all of these reasons, the Court finds there is insufficient basis to strongly infer that the Q3 2015 revenue projection in the July 29, 2015, press release was an actionable misrepresentation under section 10(b).

B.     Second Alleged Misrepresentation

Plaintiff claims his section 10(b) claim is supported by statements in Imprivata's July 29, 2015, press release that the company (1) had "completed a key acquisition," referring to HT Systems; (2) had "driven growth both through the acquisition of new customers[] and strong add-on business to our existing customers"; and (3) expected PatientSecure to "solidify [its] leadership as a security platform for healthcare."  Doc. 33 at 20; Doc. 44-12 at 6.  The Amended Complaint asserts these statements were "false and misleading because Defendants knew that the HT Systems sales pipeline was grossly exaggerated and that the PatientSecure product was not something that HT's purported prospective customers were in fact going to purchase."  Doc. 33 at 21.

The Court has no basis to strongly infer that the statements in the preceding paragraph were actionable misrepresentations, for three independently sufficient reasons.  First, the Court has insufficient basis to strongly infer that the statements were misrepresentations at all.  Although Imprivata executives were allegedly disappointed that HT Systems' prospective customers were not interested in purchasing PatientSecure, it still may have been a "key acquisition" for the company.  Moreover, when one actually views the press release, the statement about Imprivata having "driven growth through . . . the acquisition of new customers" naturally reads as a claim about the company's growth since the "one year anniversary [of its] IPO" in June 2014, not specifically about its growth due to the acquisition of HT Systems.  Doc. 44-12 at 6.  Even assuming the statement did refer to new customers gained through the acquisition of HT Systems, it could easily have been referring to its gain of that company's existing customers.  Finally, with respect to the statement that PatientSecure would "solidify [Imprivata's] leadership as a security platform for healthcare," that was not necessarily a

misrepresentation at all; even if HT Systems' sales pipeline turned out to be "false," as Plaintiff puts it, Doc. 33 at 18, PatientSecure still might have been a good enough product to advance Imprivata's stature in the field of healthcare security.

Second, even assuming the statements were misrepresentations, they were the "kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace," and thus immaterial. Shaw, 82 F.3d at 1217-18. The Court is unable to discern any meaningful difference between the sorts of statements found immaterial in Shaw – e.g., that a company was "well-positioned for growth," that it was "basically on track" and "very healthy" – and statements about completing a "key acquisition" or "solidify[ing]" leadership in an industry.

Third, even assuming the statements were material misrepresentations, there is insufficient basis to strongly infer scienter on the part of Defendants. The Court has insufficient basis to strongly infer that, even if Imprivata executives were extremely disappointed with HT Systems' purported "sales pipeline" for PatientSecure, they engaged in an "extreme departure from the standards of ordinary care" when they stated that they expected good consequences from the acquisition. In re Ariad, 842 F.3d at 750; see also supra Section III.A.2.


C.    Third Alleged Misrepresentation

Plaintiff asserts Kalowski violated section 10(b) during a conference call with investors on July 29, 2015, when he raised the low-end of Imprivata's 2015 revenue projection from $123.5 million to $124 million, and when he stated that Imprivata was "seeing increased demand for [its] subscription products." Doc. 33 at 21-22. The Amended Complaint asserts that

Kalowski knew demand for Imprivata's IT solutions had declined and would continue to fall due to the transition to ICD-10 coding and consolidation in the hospital industry. Id. at 22.

Neither of Kalowski's statements was an actionable misrepresentation. The increase of the full-year revenue projection is not actionable for essentially the same reasons that Imprivata's Q3 2015 revenue projection is not: investors were warned at the beginning of the conference call that any forward-looking statements were subject to the risk factors offered in the July 29, 2015, press release and the 10-K filed on March 11, 2015. Doc. 44-13 at 2; see also Ganem, 845 F.3d at 452 n.3. Even if the statement was not protected by the PSLRA's safe-harbor provision, Plaintiff has not alleged facts that create a strong inference that Kalowski engaged in a high degree of recklessness in failing to recognize that the transition to ICD-10 and the consolidation in the industry would keep Imprivata's 2015 revenue under $124 million.

As for Kalowski's statement that Imprivata was "seeing increased demand for [its] subscription based products," the allegations in the Amended Complaint do not create a strong inference that this was a misrepresentation, let alone a misrepresentation made with scienter. When Kalowski said there was increased demand for Imprivata's subscription-based products on July 29, 2015, it was less than a month after the end of Q2 2015, when Imprivata posted its highest quarterly revenues yet as a public company. Doc. 44-3. Unless, perhaps, there was a severe drop-off in customer interest between the end of Q2 2015 on June 30, 2015, and July 29, 2015 – which the Amended Complaint does not allege – the Court cannot strongly infer that Kalowski made a misrepresentation, much less that he made one in "an extreme departure from the standards of ordinary care." In re Ariad, 842 F.3d at 750. To the extent Plaintiff relies on FE4's allegation that "sales in the Company overall were declining during 2015" to show that Kalowski was misrepresenting information, the Court finds that argument unpersuasive because

FE4 was discussing sales "overall," while Kalowski was only discussing sales of "subscription based products.";

 

       D.      <u>Fourth Alleged Misrepresentation</u>

Plaintiff argues Hussain violated section 10(b) during the July 29, 2015, conference call when he stated that, since Imprivata "announce[d]" its acquisition of HT Systems, Imprivata had "seen tremendous interest in . . . PatientSecure from our existing customers" and that the integration of HT Systems was "going on plan, on target." Doc. 33 at 23. According to Plaintiff, these statements violated section 10(b) because "there was no interest in purchasing PatientSecure either by existing customers or by supposed customers obtained through the HT Systems acquisition," and because the integration was actually "a complete nightmare." <u>Id.</u>

The Court has no basis to strongly infer that Hussain's statement about "tremendous interest in" PatientSecure "from our existing customers" was actionable, for three independently sufficient reasons. First, the Amended Complaint's factual allegations do not support Plaintiff's assertion that "there was no interest in purchasing PatientSecure . . . by existing customers." To the extent this assertion relies on FE5's statements, those only specifically address interest among HT Systems' purported "sales prospects" (or "prospective customers"), not among existing Imprivata customers. Doc. 33 at 18-19. FE5 never states – at least with a level of clarity that would support a strong inference of wrongdoing – that existing Imprivata customers were not interested in purchasing PatientSecure. Second, even if FE5 did say that existing Imprivata customers showed no interest in purchasing PatientSecure, that statement does not necessarily contradict Hussain's statement that Imprivata had "seen tremendous interest in . . . PatientSecure from [its] existing customers." Hussain could have been referring to existing

customers' interest in learning more about the technology, not in purchasing it right away; he could simply have meant that he saw enough interest among existing customers in PatientSecure technology – which was part of a market that was "still developing," Doc. 44-14 at 14 – to raise hopes that they might be willing to purchase it in the future (perhaps after the technology developed further, or after the ICD-10 transition). Third, even assuming Hussain's statement about "tremendous interest" in PatientSecure was a misrepresentation made with scienter, the statement was akin to the "rosy affirmation[s]" that the First Circuit found immaterial in Shaw. 82 F.3d at 1217-18.

The Court likewise has insufficient basis to strongly infer Hussain's statement that the integration of HT Systems was "going on plan, on target" was an actionable misrepresentation. First, even assuming Imprivata executives were disappointed by the lack of interest among HT Systems' prospective customers in purchasing PatientSecure, the integration of HT Systems could still, overall, have been "going on plan, on target." The Court has no basis to infer that Hussain's statement about the "integration" of HT Systems *only* referred to the quality of HT Systems' sales pipeline especially when it more naturally encompasses also the integration of HT Systems' employees, its technology, and its data. Second, even assuming Hussain's statement was a misrepresentation made with scienter, the claim that an acquisition is "going on plan, on target" is akin to the rosy affirmations found immaterial in Shaw. 82 F.3d at 1217-18.

E.     Fifth Alleged Misrepresentation

Plaintiff alleges Imprivata's risk disclosures in its 10-Q, filed on July 31, 2015, were materially misleading because Defendants knew but failed to disclose that the imminent transition by Imprivata's healthcare customers to ICD-10 would take place on October 1, 2015[,] and severely diminish demand for its products." Doc. 33 at 23. This allegation fails, for three

independently sufficient reasons.  First, as stated earlier, Imprivata was "under no obligation to disclose information on industry-wide trends that was available to the public."  In re Cabletron, 311 F.3d at 36.  Second, the 10-Q stated that "new regulations" affecting the healthcare industry might adversely affect demand for Imprivata products, Doc. 33 at 23; the company was not required to specifically state that these "new regulations" included the mandatory transition to ICD-10 coding.  See In re Genzyme, 754 F.3d at 34; Isham, 665 F. Supp. 2d at 39.  Third, even assuming the 10-Q's risk disclosures were materially misleading, there is insufficient basis for the Court to strongly infer scienter.  See supra Section III.A.2.

>        F.        Plaintiff's Request for Leave to Amend

Plaintiff has not filed a motion to amend the complaint, although Plaintiff requests leave to file a second amended complaint.  Doc. 51 at 23 n.13; Doc. 52 at 33 n.9; see also Doc. 54 at 17.  The Court denies this request for three independently sufficient reasons.  First, the request is merely "in a footnote in [Plaintiff's] opposition[s] to dismissal," and thus does not constitute a "proper request," meaning this Court need not even address it.  Fire & Police Pension, 778 F.3d at 247 (citations and internal quotation marks omitted).  Second, Plaintiff was "put on notice of the deficiencies in the [Amended Complaint] by the motion[s] to dismiss," but did not claim he "had something relevant to add" to address those deficiencies.  Id. (citation omitted).  Plaintiffs are not "entitled to wait and see if their amended complaint [i]s rejected by the district court before being put to the costs of filing a second amended complaint."  ACA Fin., 512 F.3d at 57; see also In re: Biogen Inc. Sec. Litig. GBR Group, LTD, __ F.3d __, 2017 WL 1963468, at *8 (1st Cir. 2017).  Such a practice "would lead to delays, inefficiencies, and wasted work" by "both the courts and party opponents."  ACA Fin., 512 F.3d at 57.  Third, Plaintiff's request is utterly

"bare" and "there is no suggestion [by Plaintiff] that amendment would be anything other than futile." Fire & Police Pension, 778 F.3d at 247 (citations and internal quotation marks omitted). Thus, the Court denies Plaintiff's request for leave to amend.

IV.    CONCLUSION

For the foregoing reasons, the Motions to Dismiss (Doc. 39, Doc. 40) are ALLOWED and this action is DISMISSED with prejudice.[11]

                                         SO ORDERED.

                                          /s/ Leo T. Sorokin
                                         Leo T. Sorokin
                                         United States District Judge

---

[11] In its original Order, the Court stated that dismissal of this action was without prejudice, citing In re Genzyme, 754 F.3d at 47. Upon further reflection, the Court amends the dismissal to one with prejudice. In In re Genzyme, the First Circuit merely reiterated that the question of whether to dismiss with or without prejudice remains with the district court under Fed. R. Civ. P. 15. Here, the considerations favor dismissal with prejudice. Plaintiff filed this action on February 2, 2016, and filed the Amended Complaint on August 15, 2016. The instant Motions to Dismiss were filed in October 12, 2016, and became ripe on January 26, 2017. Although he had ample time after the Motions were filed and after they became ripe, Plaintiff never asked to file a second amended complaint to cure the deficiencies identified by Defendants. In light of these considerations as well as the First Circuit's direction that "a dismissal pursuant to Fed. R. Civ. P. 12(b)(6) is presumed to be with prejudice," United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 241 (1st Cir. 2004) (citations omitted), abrogated on other grounds by United States ex rel. Gagne v. City of Worcester, 565 F.3d 40 (1st Cir. 2009), this case is dismissed with prejudice.